813 So.2d 303 (2002)
Louis COLEMAN, Individually and as Father of Louis Frank Coleman
v.
Dr. Richard DENO, Dr. Ivan Sherman and Joellen Smith Hospital.
Nos. 2001-C-1517, 2001-C-1519, 2001-C-1521.
Supreme Court of Louisiana.
January 25, 2002.
Rehearing Denied March 28, 2002.
*306 Gerald E. Meunier, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, Frank J. D'Amico, Jr., New Orleans, Judy A. Gic, Counsel for Applicant in No. 2001-C-1517.
Michelle A. Bourque, Stewart E. Niles, Jr., Karen M. Fontana, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, C. William Bradley, Jr., Richard E. Gruner, Jr., Lemle & Kelleher, New Orleans, Counsel for Respondent in No. 2001-C-1517.
Stewart E. Niles, Jr., Karen M. Fontana, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, Counsel for Applicant in No. 2001-C-1519.
Michelle A. Bourque, Gerald E. Meunier, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, Frank J. D'Amico, New Orleans, Judy A. Gic, C. William Bradley, Jr., Richard E. Gruner, Jr., Lemle & Keleher, New Orleans, Counsel for Respondent in No. 2001-C-1519.
Michelle A. Bourque, New Orleans, Counsel for Applicant in No. 2001-C-1521.
Stewart E. Niles, Jr., Karen M. Fontana, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Gerald E. Meunier, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, Frank J. D'Amico, Jr., New Orleans, Judy A. Gic, C. William Bradley, Jr., Richard E. Gruner, Jr., Lemle & Kelleher, New Orleans, Counsel for Respondent in No. 2001-C-1521.
Charles F. Gay, Jr., New Orleans, Don S. McKinney, Counsel for Amicus Curiae Ochsner Clinic Foundation and American College of Emergency Physicians.
Lawrence S. Kullman, New Orleans, Counsel for Amicus Curiae Louisiana Trial Lawyers Association.
Carlton Jones, III, David A. Woolridge, Baton Rouge, Counsel for Amicus Curiae Patients Compensation Foundation Oversight Board.
Gregory D. Frost, Larry M. Roedel, Baton Rouge, Counsel for Amicus Curiae Louisiana Dental Association.
Amy W. Phillips, Baton Rouge, Robert G. Pugh, Jr., Shreveport, Counsel for Amici Curiae Louisiana State Medical Society, Orleans Par. Medical Society, Jefferson Medical Society, Iberville Parish Medical *307 Society, St. Martin Medical Society, Rapides Parish Medical Society, Calcasieu Parish Medical Society, Lafayette Parish Medical Society, St. Bernard Parish Medical Society, Acadia Parish Medical Society, East Baton Rouge Parish Medical Society, American Medical Association, Shreveport Medical Society, Louisiana Trial Lawyers Association.
LOBRANO, Justice Pro Tempore.[*]
We granted certiorari in this case primarily to determine whether the court of appeal erred in recognizing an intentional tort cause of action against an emergency room physician for improper transfer of a patient under general tort law, which is outside the scope of the limitations set forth in the Medical Malpractice Act, La. R.S. 40:1299.41, et seq. (MMA). After review of the evidence, we conclude that the plaintiff-patient's cause of action against the defendant-doctor is based solely on medical malpractice and thus the court of appeal's finding of an intentional tort of "patient dumping" is in error. With respect to the medical malpractice liability, we find no manifest error in the jury's finding of malpractice on the part of the defendant-doctor; however, we reallocate fault between the defendant-doctor and the non-party charity hospital. With respect to damages, we remand to the court of appeal for both a meaningful quantum review and a recasting of the ultimate judgment in accordance with the limitations of the MMA.

Facts
On June 11, 1988, Louis Coleman, then thirty-two years old, underwent surgery at Charity Hospital in New Orleans (CHNO). During that surgery, his left arm was amputated to save his life. Coleman initially sought emergency treatment at JoEllen Smith Hospital (JESH), where he presented twice within a forty-hour interval on June 7 and 8, 1988. On the second visit to JESH, the emergency room physician transferred Coleman to CHNO.
Coleman first visited JESH at 1:44 a.m. on June 7, 1988. On that occasion, Coleman never complained of any problems with his arm. Rather, Coleman told the triage nurse that he had pulled something in his chest while lifting and that all movement hurts including deep breathing. With the exception of an elevated temperature (100.3~F), his vital signs were normal. Dr. Ivan Sherman, the emergency room physician who examined Coleman, found his chest was clear, but his chest wall was tender. Dr. Sherman ordered an EKG and a chest x-ray. Based on the negative results of those tests and the physical examination, Dr. Sherman diagnosed chest pain and costochondritis, which is an inflammation of the area between the ribs and sternum
At 3:45 a.m., Coleman was discharged with instructions to take the prescribed medication, Naprosyn (an anti-inflamatory); to apply heat to his chest; and to follow-up with a named physician. Realizing that all area pharmacies were closed at that time of day, Dr. Sherman not only gave Coleman a prescription for Naprosyn, but also ordered that an initial double dose of Naprosyn be dispensed to him in the emergency room.
At 8:10 p.m. on June 8, 1988, Coleman returned to JESH. Coleman told the triage nurse that at about 3:00 or 4:00 a.m. that day his left arm had started aching and swelling. Coleman testified that he attributed these symptoms to be *308 side effects of the Naprosyn. The triage nurse noted that Coleman's arm was swollen with warm bullae in the left antecubital space. With the exception of an elevated temperature (102.8~F), and heart rate (120 beats per minute), his vital signs were normal. Dr. Richard Deno, the emergency room physician who examined Coleman, documented his findings by drawing a picture of Coleman's left arm on which he depicted: (1) small bullous lesions; (2) a hot, swollen area (which, using his engineering background, he depicted by using thrash marks); and (3) track marks (consistent with intravenous drug abuse).
Dr. Deno initially believed that Coleman could be treated on an outpatient basis and thus wrote discharge instructions (similar to Dr. Sherman's) for outpatient treatment with oral antibiotics and follow-up with a named physician. However, upon receiving the laboratory results reflecting a markedly elevated white blood count (27.1), Dr. Deno diagnosed Coleman with left arm cellulitis,[1] and determined that Coleman required inpatient intravenous antibiotic treatment. At that point, the treatment decision became where Coleman should receive such treatment. Ultimately, Dr. Deno determined that a transfer for inpatient admission at CHNO was appropriate for two reasons: (1) given Coleman's lack of insurance he would not be able to financially afford private hospitalization at JESH;[2] and (2) given CHNO-a Level I Trauma Center with a full-scale, on-site laboratorywas better equipped and more experienced than JESHa Level II Trauma Center lacking such an inhouse laboratoryat treating complicated infections of the type experienced by Coleman.
An evidentiary ruling by the trial judge precluded the parties from informing the jury of the former, financial reason for the transfer to CHNO. The sole reason explored at trial was the latter, i.e., CHNO's superior resources. In that regard, Dr. Deno testified that although JESH rarely treats intravenous drug abuse cellulitis, CHNO (where Dr. Deno also practiced) routinely treats this type of complicated infection.
To facilitate Coleman's transfer, Dr. Deno telephoned the CHNO Accident Room charge resident, who accepted Coleman for admission. Documenting this call in the medical record, Dr. Deno wrote "[t]ransfer to Charity, charge resident in accident room accepted,"[3] and Coleman signed that record documenting the decision to transfer to CHNO.[4]
Once the charge resident accepted Coleman for admission, Dr. Deno testified that it was contraindicated for him to draw *309 blood cultures or to do any further evaluation at JESH. Likewise, Dr. Deno explained that it was contraindicated for him to commence antibiotic treatment as that would distort the blood cultures, and CHNO, as the receiving provider, would want to perform its own cultures. Still further, Dr. Deno explained that any of these treatments would have only delayed Coleman's arrival at CHNO, which is less than a half hour drive from JESH.[5]
Given that Coleman was stable, in good condition, ambulatory, and accompanied by his girlfriend, Dr. Deno saw no need to transfer by ambulance; instead, he found it wholly appropriate for Coleman to self-transport. While Coleman and his girlfriend both testified that Dr. Deno approved their request to first go homea forty-five minute driveand get pajamas and other personal belongings before going to CHNO, Dr. Deno testified that he would have never authorized such a detour and denied any such conversation took place. Moreover, Coleman signed the discharge sheet instructing that he was to go "directly" to CHNO and to bring with him the copies he was given of the JESH laboratory work.
Although Coleman was discharged from JESH at 10:00 p.m. on June 8th, he did not arrive at CHNO until about 12:30 a.m. on June 9th. At 12:46 a.m., he was seen by the triage nurse. Coleman's chief complaint was left arm edema. In accordance with CHNO accident room protocol, Coleman was screened by a physician, who ordered blood work and cultures, which were taken at 1:30 a.m. and showed a white blood count of 29.9. Left arm x-rays were taken at 5:00 a.m. and showed a significant amount of soft tissue swelling in the left forearm and elbow consistent with a history of cellulitis; the x-rays, however, showed no sign of gas in the tissue.
At CHNO, Coleman gave two different versions of the cause of his arm ailment. Initially, he gave the nurse a history of having a crushing type injury on Sunday when he fell off a boat and was wedged between the wharf and the boat. Subsequently, he gave a history of someone holding him down in a car when he was intoxicated and injecting something in his left arm.
The attending physician's note dated June 9th described Coleman as "alert, oriented and cooperative" and not in acute distress. The physician further noted that Coleman told him the following: (i) that he had swelling up to his elbow and by late in the evening it was extremely painful and the swelling extended up into his arm; (ii) that the only recent trauma to his arm occurred four days before his admission when some people injected something into his arm while holding him down; (iii) that his work involved unloading seafood in crates from a truck, but that he did not work directly with the fish or oysters and that he denied any recent cuts while working; and (iv) that he denied intravenous drug abuse. The physician still further noted that Coleman's left arm was "swollen and warm from the mid arm to lower forearm, with no fluctuant areas, no streaking, positive axillary node and positive track marks." The physician, apparently repeating the radiology results, noted the absence of any "gas in tissue" and the presence of "soft tissue swelling." The physician ordered that Coleman be admitted with a diagnosis of cellulitis of the left arm and forearm. The physician also ordered intravenous antibiotics (Nafcillin) treatment, which was initiated at 8:00 a.m. on June 9th, over seven hours after he arrived at CHNO.
*310 On June 10th, the attending physician noted that Coleman was aferile today (fever free), and enumerated the following three-part treatment plan: (1) surgery consult, (2) blood count (CBC), and (3) continue antibiotic (Nafcillin). On June 11th, the physician noted that Coleman reported his arm appeared to be improving, and the hospital records note that his arm appeared to be responding to the antibiotic treatment. The nurse's notes, however, indicate that at 6:00 p.m. on June 10th his arm had "visibl[bly] increase[d] in size," and at 6:00 a.m. on June 11th his arm was emanating an extremely foul odor.
Although on June 10th the attending physician recognized the need for a surgical consult, such consult was not requested until the following day. At 1:00 p.m. on June 11th, Dr. Clyde Redmond, then a surgical resident at CHNO, first saw Coleman. Dr. Redmond testified that, although over a decade elapsed between the treatment at issue and the trial of this matter, he specifically recalled Coleman's case having occurred during the week before his wedding. Specifically, Dr. Redmond stated that he recalled June 11, 1988 was a Saturday, and he was leaving the hospital to go shopping for clothes for his honeymoon that day when he spotted in the surgical consult box the request regarding Coleman's case. That request, which had just been placed in the box, described Coleman's case as an admission on June 9th for left arm cellulitis with a white blood count of 29 and a temperature of 39~C. Dr. Redmond decided to delay his shopping trip to check on this case.
Upon examining Coleman's arm, Dr. Redmond found a much more advanced infectious process than cellulitis. Moreover, he noted that Coleman's arm was draining an extremely foul smelling pus. Dr. Redmond also found crepitus, which is a tactile finding of gas in the tissue; he described crepitus as similar in feeling to the bubble packing material used to ship fragile things. X-rays taken at 2:00 p.m. of Coleman's forearm confirmed that Coleman had "soft tissue swelling and some air within the soft tissues, apparently secondary to cellulitis." Hence, at 4:10 p.m., Coleman was taken to surgery.
Upon opening Coleman's arm, Dr. Redmond discovered that the skin, fat and bulk of the muscles in the arm were dead and determined that it was necessary to perform an open left shoulder disartiulation, i.e., to amputate the left arm at the shoulder. Before performing such a drastic procedure, however, Dr. Redmond obtained an orthopedic consult. The orthopedic surgeon who performed the consultation confirmed that an amputation was necessary as a life saving measure. The orthopedic surgeon's note states that Coleman's arm was emanating a foul smelling pus and that although upon admission his diagnosis was cellulitis he subsequently had developed a necrotizing fascitis.
Although the initial operative diagnosis was a clostridium or gas gangrene infection, the final laboratory results did not confirm that diagnosis. The final laboratory reports indicated that the cultures from surgery showed Coleman's arm was infected with peptostreptococcus, a common infection among intravenous drug abusers, and with alpha and beta streptococcus. Based on that final laboratory results, Dr. Redmond testified at trial that Coleman developed a compartment syndrome at some point between 4:00 p.m. on June 10th and 4:00 a.m. on June 11th, which resulted in the loss of his arm.[6]
*311 After several subsequent surgical procedures, Coleman was discharged from CHNO on June 28, 1988.

Procedural background
On April 17, 1989, Coleman requested a medical review panel under the Medical Malpractice Act, La. R.S. 40:1299.41, et seq., seeking review of his claim that three qualified private providersDr. Sherman, Dr. Deno and JESHnegligently treated (or failed to treat) him on June 7 and 8, 1988. Simultaneously, Coleman filed a request for a medical review under the Medical Liability for State Services Act, La. R.S. 40:1299.39, et seq, seeking review of his claim that CHNO negligently treated (or failed to treat) him from June 9 to 12, 1988. Coleman settled with CHNO pre-trial for $25,000. Nonetheless, the issue of CHNO's fault was put before the jury by way of special interrogatory.
On May 1, 1990, the medical review panel found that none of the private providers breached the standard of care and that the conduct Coleman complained of was not a factor in the resultant damages. Given that adverse panel decision,[7] on July 27, 1990, Coleman filed the instant suit naming as defendants the three qualified private providers. On March 27, 1991, Coleman filed a supplemental and amending petition alleging that defendants violated the federal anti-dumping provisions.[8] Thereafter, Coleman settled his claim against JESH for $10,000, and dismissed JESH pre-trial. The jury was not requested to consider JESH's fault.
In March 1999, this matter was tried before a jury. On the second day of the trial in this matter, Dr. Deno filed a peremptory exception of no cause of action and prescription to Coleman's federal dumping claim on the basis that the applicable statutory provision, the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (EMTALA), applies solely to hospitals, not physicians. Joined with those exceptions was a motion in limine, seeking to exclude any reference to the EMTALA claim or to Coleman's lack of insurance or finances to pay for private hospitalization. The trial judge granted both the exception of no cause of action and the motion in limine.
Following an eleven-day trial, the jury found that both Dr. Deno's and Dr. Sherman's conduct fell below the standard of care and apportioned fault 80% to the former and 20% to the latter. The jury found neither Coleman nor CHNO were at fault. The jury awarded $4,400,000 in general damages, $500,000 in lost wages, earning capacity, and replacement of personal services, and found Coleman in need of future medical care and related benefits in an amount of $500,000. The jury also awarded $1,000,000 in loss of consortium to Coleman's son.
*312 Ruling on the various post-trial motions filed by the parties, the trial court granted Dr. Sherman's motion for judgment notwithstanding the verdict (JNOV). The court also granted remittitur as to the claim of Coleman's son reducing that award from $1,000,000 to $10,000. The court found that interest was to be apportioned as provided in La. R.S. 40:1299.41, et seq. The court noted the jury's finding that Coleman was in need of future medical care and related benefits in the amount of $500,000, but did not enter judgment on this sum. The trial court thus amended the judgment to find Dr. Deno solely at fault, but applied the MMA to limit the damage award against him to $100,000.[9] The trial court noted the parties had stipulated that Coleman settled with CHNO for $25,000 and JESH for $10,000. Rejecting the contention of the PCF, a post-trial intervenor, that it was entitled to a credit of $110,000 for those two pre-trial settlements, the trial court entered judgment against the PCF for $400,000 plus interest in accord with the MMA.
On appeal, a divided five-judge panel affirmed in part, amended in part, and reversed in part. 99-2998 (La.App. 4th Cir.4/25/01), 787 So.2d 446. First, the appellate court held that Coleman's amended petition stated an intentional tort cause of action for improper transfer against Dr. Deno outside the scope of the MMA and thus not subject to that Act's limitations on damages. Second, the court affirmed the grant of JNOV dismissing the claim against Dr. Sherman. Third, the court affirmed the jury's finding of fault as to Dr. Deno's breach of the standard of care for emergency physicians by failing to provide immediate antibiotic treatment to Coleman. The court also affirmed the jury's finding that CHNO did not breach its standard of care, reasoning that "the jury could have concluded that the plaintiff's arm could have been saved if Dr. Deno had treated him with antibiotics on June 8, 1988." 99-2998 at p. 34, 787 So.2d at 471. The court further affirmed the jury's finding that Coleman was in need of future medical care and benefits in the amount of $500,000, and the trial court's judgment recognizing this finding of need without entering a judgment on this sum. Finally, the court affirmed the quantum awards, totaling $4,900,000, and allocated $500,000.00 to the malpractice claim and $4,400,000.00 to the intentional tort claim.[10]
As to the entitlement to credits for the settlements with CHNO and JESH, the court held that the PCF was entitled to a credit of $100,000.00 for the larger settlement of $25,000 with CHNO and a dollar-for-dollar credit for the smaller settlement of $10,000 with JESH.
The dissenting appellate court judges opined that Coleman had no cause of action under either EMTALA because it provides a private right of action only against participating hospitals or under the Louisiana anti-dumping statute because it lacks an express private cause of action; hence, the dissenters would have held that all of Coleman's claims fell within the purview of the MMA. In addition, the dissenters found "overwhelming evidence" of CHNO's fault and would have apportioned fault equally between Dr. Deno and CHNO. 99-2998 at p. 18, 787 So.2d at 493.

Analysis
We granted and consolidated the writ applications of plaintiff, Coleman; defendant, *313 Dr. Deno; and intervenor, the PCF. 01-1517 & 01-1519 (La.9/14/01), 795 So.2d 1220; 01-1521 (La.9/14/01), 796 So.2d 666. However, as we initially noted, the primary concern which prompted our writ grant is Dr. Deno's argument that the court of appeal erred in crafting an intentional tort of "patient dumping" to circumvent the MMA's limitation of liability. Hence, we address that argument first.

Intentional tort of improper transfer
While the trial court granted Dr. Deno's exception of no cause of action as to Coleman's "patient dumping" allegations, the court of appeal characterized the claim as an intentional tort of improper patient transfer based on Louisiana tort law, La. C.C. art. 2315. As such, the court reasoned that it was not "malpractice" under the MMA. In so holding, the appellate court concluded that Coleman plead two distinct causes of action: (1) negligent failure to treatmalpractice, and (2) an intentional tort based on EMTALA for transfer to CHNO because of lack of fundsnot malpractice. For the following reasons, we reverse the appellate court's conclusion that Dr. Deno was additionally at fault under general tort law for the intentional tort of "patient dumping".
The nature of the claim of improper transfer in this case is really a claim of failure to properly diagnose, failure to stabilize, or both. That is what the petition alleges, and that is what the evidence suggests to be the basis of Coleman's claim. The court of appeal, with little analysis and citing no authority, characterized such a claim as outside the scope of "malpractice" under the MMA and thus justified the entire $4,900,000 jury award. In so doing, we hold that the appellate court erred both procedurally and substantively.
Procedurally, neither Coleman's original nor amended petition alleges an intentional tort. The original petition alleges only medical malpractice; the amended petition alleges only negligence per se based on EMTALA. Nor were the pleadings expanded at trial, as provided for in La. C. Civ. P. art. 1154, to include such an alleged intentional tort. To the contrary, the effect of the trial court's granting of Dr. Deno's combined exception of no cause of action and motion in limine was to exclude any mention before the jury of either the financial reasons for the transfer or the EMTALA claim.[11] The court of appeal thus crafted an intentional tort that was not plead, not prayed for in relief, not argued, not tried, and not submitted to the jury.
Substantively, the court of appeal reasoned that "[t]he `patient dumping' cause of action refers to an intentional tort where Dr. Deno directed plaintiff's transfer to Charity for lack of finances or insurance although it conflicted with JoEllen Smith Hospital's written policy." 99-2998 at p. 19, 787 So.2d at 463.[12] Acknowledging that neither EMTALA nor the Louisiana statutory counterpart provides a private cause of action against a physician for patient dumping,[13] the court reasoned that it could "find no express state law that excludes recovery under La. C.C. art. *314 2315, general tort law, or La. R.S. 40:2113.4-40:2113.6 [the Louisiana anti-dumping statute] against physicians for the intentional tort of patient dumping." Id. (emphasis added). Stated otherwise, the court reasoned that no statutory provision precludes a finding of liability under Louisiana tort law when a physician engages in the exact misconduct targeted by those anti-dumping statutes.
While the court of appeal reasoned that plaintiffs reference to anti-dumping statutes in his amended petition sufficed to state a cause of action under Article 2315, the issue before us is whether that characterization of plaintiffs assertions and the evidence in support thereof as outside the scope of "malpractice" under the MMA was correct. In resolving that issue, we begin by distinguishing this case from our prior two decisions in which we have addressed "patient dumping"[14] claims under the EMTALA and the Louisiana statutory counterpart. Spradlin v. Acadia-St. Landry Medical Foundation, 98-1977 (La.2/29/00), 758 So.2d 116; Fleming v. HCA Health Services of Louisiana, Inc., 96-1968 (La.4/8/97), 691 So.2d 1216. In both those prior cases the defendant was a hospital; the defendant in this case is an emergency room physician. The significance of this distinction is two-fold. First, the statutory duties imposed by EMTALA, and the Louisiana statutory counterpart, apply only to participating hospitals, not physicians.[15] Second, hospitals are distinct legal entities that do not, in the traditional sense of the term, "practice" medicine; whereas, physicians do "practice" their profession, and their negligence in providing such professional services is termed "malpractice." Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 21-2 (1996). The significance *315 of the term "malpractice" is that it is used to differentiate professionals from nonprofessionals for purposes of applying certain statutory limitations of tort liability. Id. The limitation of tort liability at issue in this case is the MMA.
The MMA applies only to "malpractice;" all other tort liability on the part of a qualified heath care provider is governed by general tort law. Spradlin, supra. "Malpractice" is defined by La.Rev. Stat. 40:1299.41A(8) as follows:
"Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient.... (Emphasis added).
La.Rev.Stat. 40:1299.41 A(7) and (9) further define "tort" and "health care" as follows:
"Tort" means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
"Health care" means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement.
Both statutory patient dumping claims and medical malpractice claims are simply particularized forms of torts that often overlap. However, even though all medical malpractice claims are personal injury claims, "the opposite is not true: every personal injury claim is not a medical malpractice claim." Scott E. Hamm, Note, Power v. Arlington Hospital: A Federal Court End Run Around State Malpractice Limitations, 7 B.Y.U. J. Pub. L., 335, 347-48 (1993). It follows then that the court of appeal in this case legally erred in characterizing a claim for patient "dumping" as always giving rise to an intentional tort and in reasoning that a bright line can be drawn between medical malpractice claims and patient "dumping" claims. Recognizing that the two claims can overlap, we determine in this case that Coleman's claim of "dumping" improper transferis one of malpractice governed by the MMA.

Standard for defining a medical malpractice claim
In determining whether certain conduct by a qualified health care provider constitutes "malpractice" as defined under the MMA this court has utilized the following three factors:
"[1] whether the particular wrong is `treatment related' or caused by a dereliction of professional skill,
[2] whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached, and
[3] whether the pertinent act or omission involved assessment of the patient's condition."
Sewell v. Doctors Hospital, 600 So.2d 577, 579 n. 3 (La.1992)(quoting Holly P. Rockwell, Annotation, What Patient Claims Against Doctor, Hospital, or Similar Health Care Provider Are Not Subject to Statutes Specifically Governing Actions and Damages for Medical Malpractice, 89 *316 A.L.R.4th 887, 1991 WL 741765 (1991)).[16] The latter annotation lists three additional factors that courts have considered, and we now add those to our Sewell list; to wit:
[4] whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,
[5] whether the injury would have occurred if the patient had not sought treatment, and
[6] whether the tort alleged was intentional.
89 A.L.R.4th at 898.
Applying those six factors to the evidence in this case leads to the inescapable conclusion that Coleman's claim of improper transfer against Dr. Deno is within the scope of the MMA.

(i) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill
Coleman contends that Dr. Deno's misconductwhich is the same as a statutory patient dumping violationdoes not involve a breach of professional standard. Dr. Deno's "critical" fault, according to Coleman, was beyond professional treatment in that he directed that Coleman be transferred to CHNO after recognizing Coleman's need for immediate hospitalization. Coleman further contends that, contrary to Dr. Deno's suggestion, this transfer was not ordered for medical reasons CHNO's superior resourcesbut for economic reasonsColeman's lack of insurance or the finances to pay the hospital bill. Coleman characterizes this as not a medical decision but rather an economic one.
Coleman's attempt to draw a distinction between Dr. Deno's professional treatment properly diagnosing his condition and properly determining he needed intravenous antibiotic treatmentand Dr. Deno's decision to transfer to CHNO for economic reasons is without merit. To the extent Coleman relies on Spradlin to support this distinction, his reliance is misplaced. Coleman incorrectly reads our decision in Spradlin as "suggesting that a health care provider may be liable under the general tort law of Louisiana for making a decision with regard to a patient that is economicallyrather than medically driven." To the contrary, we narrowly framed the issue before us in Spradlin as whether the MMA's pre-suit medical review panel applies to an EMTALA claim joined with a malpractice claim. In resolving that issue, we relied solely on federal preemption to hold that the medical review panel requirement did not apply; we did not address the nature of an EMTALA claim.[17]
*317 A similar argument was likewise rejected in Bolden v. Dunaway, 97-1425 (La. App. 1st 12/28/98), 727 So.2d 597, writ denied, 99-0275 (La.3/26/99), 739 So.2d 801.[18] In Bolden, the plaintiffs alleged that "Dr. Dunaway's non-medical related decision to leave the hospital and not operate on his patient prepped for surgery because his fee was not in his pocket, was a non-medical related intentional act not based on rendering professional health care services as defined by LSA R.S. 40:1299.41(8) and therefore not covered by the medical malpractice act." 97-1425 at p. 3, 727 So.2d at 599. Rejecting that contention and characterizing the plaintiffs' claim as malpractice (failing to render professional services), the court of appeal noted that "the legislature did not intend for applicability of the Medical Malpractice Act to depend on the motives of the doctors, be it greed or philanthropy, at the time of the alleged wrongful acts." 97-1425 at p. 6, 727 So.2d at 601.
Contrary to Coleman's suggestion that the decision to transfer can be divorced from the other treatment decisions Dr. Deno made, we conclude that the decision as to where Coleman should be treated CHNO of JESHwas a part of his medical treatment. See Vachon v. Broadlawns Medical Foundation, 490 N.W.2d 820 (Iowa 1992)(holding that decision of whether patient should be transferred for care to charity hospital, which was the only Level I full tertiary care center, or to private a hospital that was closer was part of "treatment" of patient who developed compartment syndrome).

(ii) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached
In discussing the need for expert evidence in medical malpractice cases in Pfiffner v. Correa, 94-0924, 94-0963, and 94-0992 (La.10/17/94), 643 So.2d 1228, we cited as examples of "obvious negligence" for which no expert testimony would be required to establish a physician's fault the "[f]ailure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary." 643 So.2d at 1234. These examples of obvious negligence in refusing to treat a patient are distinguishable from the facts presented in this case.
This was not a case in which the alleged wrongful conduct could be evaluated based on common knowledge. Expert testimony was clearly required both to establish whether the standard of care for an emergency physician at a Level II Trauma Center was breached and to evaluate this claim. Hindsight likewise establishes the need for expert testimony in this case given the sheer number of experts that were called to testify.

*318 (iii) whether the pertinent act or omission involved assessment of the patient's condition

The decision to transfer clearly was based on an assessment of Coleman's condition. As Dr. Deno stresses, the decision to transfer to another trauma center was made after a complete medical evaluation (including a physical and blood work) and after a determination that Coleman's medical status was stable. Relevant to this decision was a determination that the receiving facility (CHNO) had better access to laboratory and radiology at the time of the transfer (in the middle of the night) and was better able to care for Coleman's condition. Merely because Dr. Deno also inquired into Coleman's financial status did not remove this matter from the arena of medical malpractice.

(iv) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform
This transfer decision clearly occurred in the context of a physician-client relationship between Dr. Deno and Coleman and clearly was within the scope of the activities JESH is licensed to perform. As discussed above, Coleman's attempt to divorce this transfer decision from the treatment decisions Dr. Deno made is without merit.

(v) whether the injury would have occurred if the patient had not sought treatment
This injury allegedly caused by a delay in treatment due to an allegedly improper, economically motivated transfer clearly is linked to treatment. In an attempt to distant this decision from treatment, an amicus analogizes Dr. Deno's transfer decision to that of "the cashier at the hospital's window." That is simply not an accurate analogy. Coleman concedes that Dr. Deno provided some treatment, including correctly diagnosing cellulitis and correctly determining his need for inpatient antibiotic treatment. Coleman contests Dr. Deno's failure to provide enough treatment. Coleman's "patient dumping" claim is thus premised on conduct that he urges would violate EMTALA's (and the parallel Louisiana statutory counterpart's) duty on hospitals to stabilize a patient who presents with an emergency medical condition. Common sense indicates that a claim based on failure to provide enough treatment is clearly linked to treatment.

(vi) whether the tort alleged was intentional
For the reasons discussed, the court of appeal's characterization of Coleman's dumping claim as an intentional tort is both procedurally and substantively flawed. Indeed, the conduct in this case bears no resemblance to the type of intentional dumping cited in Pfiffner, supra, as examples of "obvious negligence" for which expert testimony would not be required. 643 So.2d at 1234.
Accordingly, we conclude that the entirety of the conduct on which plaintiffs claim against Dr. Deno is based fits within the ambit of the statutory definition of "malpractice," which expressly includes refusal to treat and treatment "which should have been performed or furnished." La. R.S. 40:1299.41 A(8) and (9). Coleman's claims are therefore entirely governed by the limitations of the MMA. We now turn to the arguments relative to the malpractice claims.

Coleman's arguments
Coleman raises two assignments of error. First, given the evidentiary basis supporting the jury's finding of fault on *319 Dr. Sherman's part for failing to diagnose and treat Coleman's arm infection on June 7, 1988, Coleman contends that the lower courts erred in granting Dr. Sherman's JNOV motion. Second, Coleman contends that the court of appeal erred in giving the PCF a credit of $110,000 for the settlements with JESH and CHNO. Given these settlements were each for less than $100,000 and given that neither healthcare provider was found liable, Coleman contends the PCF was not entitled to a credit.
As to the PCF's entitlement to a credit, we pretermit addressing this issue given our decision to remand this case to the court of appeal on the issues of quantum and application of the MMA's limitations to the ultimate damage award.
As to the granting of JNOV in Dr. Sherman's favor, we readily reject plaintiffs argument and cite with approval the appellate court's reasoning on this issue:
[P]laintiff did not complain to Dr. Sherman about his arm when Dr. Sherman saw him. The plaintiffs primary complaint was chest pain. The plaintiffs generalized symptoms did not develop into swelling in the area of plaintiffs arm until after the plaintiffs initial visit to the emergency room where Dr. Sherman examined him.
. . .
[R]esolving all reasonable inferences or factual questions in favor of the plaintiff, the evidence points so strongly in favor of Dr. Sherman that reasonable men could not find that his actions or inactions on June 7, 1988 proximately caused the ultimate loss of the plaintiffs left arm.
99-2998 at pp. 22-24, 787 So.2d at 465-66. We thus affirm the appellate court's holding that the trial court did not err in granting Dr. Sherman's JNOV motion.

Dr. Deno's arguments
Dr. Deno raises twenty assignments of error. We have already addressed and agreed with his arguments relative to the characterization by the court of appeal of Coleman's claim as an intentional tort of "patient dumping." In the remaining assignments, Dr. Deno contends that the lower courts were manifestly erroneous in finding that he breached the standard of care for emergency physicians and that his breach was a proximate cause of Coleman's harm. Dr. Deno argues that the same evidence that established Dr. Sherman's entitlement to JNOV and CHNO's lack of fault likewise supports a finding in his favor.
Initially we note that the appellate court's reasons in support of Dr. Sherman's JNOV, and which we relied on, are clearly not applicable to the claim against Dr. Deno. The presentation Coleman made to Dr. Sherman was simply factually different from that confronting Dr. Deno. And, because we are guided by the manifest error rule, we must also disagree with Dr. Deno's argument that the jury was clearly wrong in finding fault on his part. While we admit it is a close call, the evidence sufficiently supports a finding of some fault by Dr. Deno, although not 100% of the fault. In failing to allocate any fault to CHNO, we find that the jury manifestly erred.
Plaintiff presented two experts who both opined that Dr. Deno breached the standard of care for an emergency room physician at a Level II Trauma Center by failing to provide immediate antibiotic treatment.
Dr. Paul Blaylock, who was board-certified in both emergency and legal medicine, testified that no valid medical reason existed for Dr. Deno to send Coleman to CHNO, a Level I Trauma Center, at a *320 time when his severe arm infection required immediate attention. More particularly, Dr. Blaylock testified that Dr. Deno should never have discharged Coleman without treatment because "the risk of the infection getting worse, much worse, was very high." Dr. Blaylock further testified that if Dr. Deno was going to transfer Coleman, he should have called to assure that Coleman could be directly admitted, should have commenced intravenous antibiotic treatment, should have taken cultures (both blood and infection site), and should have transferred by ambulance. Dr. Blaylock still further testified that soft tissue infections are time related; "[t]he sooner you diagnose the infection; the sooner you treat it, the better the progress." Dr. Blaylock opined that Coleman's arm, to a medical probability, would have been saved had proper medical treatment been provided when he was under Dr. Deno's care.
Similarly, Dr. Neil Crane, who was board-certified in both internal and infectious disease medicine, testified that on June 8th Dr. Deno was confronted with a "necrotizing cellulitis"an infection associated with a progressive death of tissue. This type infection, Dr. Crane testified, progresses exponentially; thus, the earlier the treatment, the better the chance of achieving a good result. Dr. Crane further testified that on June 8th when Coleman presented to Dr. Deno his condition was both "limb threatening and life threatening," requiring immediate emergency treatment. That treatment, Dr. Crane testified, included taking cultures of fluid at the infection site, initiating intravenous antibiotic treatment, and obtaining a surgical consult. Dr. Crane opined the treatment delay Dr. Deno caused by sending Coleman to CHNO was significant given the progressive nature of the infection and that appropriate treatment by Dr. Deno would have salvaged Coleman's arm from amputation.
While the jury also was presented with contrary expert testimony by defendants' experts, the above testimony by plaintiff's experts is sufficient to support the jury's finding of fault on Dr. Deno's part. In this regard, we quote with approval the dissenting judge's statement that "the record contains evidence that Mr. Coleman might not have lost his arm had Dr. Deno started giving him intravenous antibiotics prior to his transfer, then had him transferred by ambulance, rather than allowing Mr. Coleman the opportunity to delay the time at which he reported to CHNO." 99-2998 at p. 18, 787 So.2d at 493 (Plotkin, J., dissenting). We thus conclude, as did the appellate court, that the jury was not manifestly erroneous in finding some malpractice liability on Dr. Deno's part. However, for those same reasons we find that the jury was clearly wrong in not allocating any fault to CHNO.

Reallocation of fault
As the dissenting judge aptly notes, the record contains "overwhelming evidence" of CHNO's fault. Id.
Since the evidence was sufficient to support the jury's finding of fault on Dr. Deno's part in failing to timely administer intravenous antibiotics, it was clear error for the jury not to find fault on CHNO's part for the same reason. CHNO failed to administer intravenous antibiotics until over seven hours after Coleman presented there. Such failure to administer antibiotics timely is malpractice. Furthermore, the evidence strongly suggests that CHNO is additionally at fault for the delay in obtaining a surgical consult. Although the need for such a consult was recognized on June 10th, Dr. Redmond was not consulted until June 11th. As a result of that delay, Dr. Redmond testified that the short window of opportunity for surgical intervention *321 to treat the compartment syndromefour to six hours-was lost.[19] Other defense experts offered similar opinions regarding the compartment syndrome causing the loss of Coleman's arm.
For these reasons we conclude that an appropriate allocation of fault is 25% to Dr. Deno and 75% to CHNO.

PCF's arguments
The only issue raised by the PCF that we have not yet addressed is its argument that the trial court erred in allowing plaintiffs witnesses to testify regarding the cost of future medical care given that no specific award can be made for such item. However, because this matter is to be remanded to the court of appeal for a quantum review and for the application of the MMA's limitation to the ultimate damage award, we pretermit any discussion on this issue.

Damages
The most glaring error in the appellate court's analysis is in the treatment of damages, especially general damages. The entirety of the appellate court's review of the jury's $4,400,000 general damage award is a paragraph. In that paragraph, the court notes that while the trial court reviewed that part of the jury's award restricted by the MMA's cap, it did not review the part not restricted by the cap. The appellate court, without explanation, apparently allocated the entire award over the MMA's $500,000 cap$4,400,000to general damages. As to whether that was an excessive quantum award, the appellate court's reasoning was that it is the purpose of the jury to make the "very difficult" decision of the value of the loss of an arm. 99-2998 at p. 42, 787 So.2d at 475.
The appellate court's one paragraph analysis of this sizeable general damage award was not sufficient to constitute a meaningful review of general damages. Indeed, the appellate court failed to make even the initial inquiry required for a meaningful review of a general damage award of "whether the particular effects of the particular injuries to the particular plaintiff are such that there has been an abuse of the `much discretion' vested in the judge or jury." 1 Frank L. Maraist & Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 14.14 (1999).
Given our conclusion with respect to the quantum review, coupled with our reversal of the intentional tort (which the appellate court referred to as the part "that is not restricted by the Act's cap" 99-2998 at p. 42, 787 So.2d at 475), we deem it necessary to remand. On remand, the court of appeal is instructed both to conduct a meaningful quantum review and to render judgment in accordance with the limitations of the MMA.

Decree
For the foregoing reasons, we affirm the finding of malpractice liability on the part of Dr. Deno and the grant of judgment notwithstanding the verdict dismissing the malpractice claim against Dr. Sherman. We modify the fault allocation and hold that Dr. Deno was only 25% at fault. We remand this matter to the court of appeal for a review of damages and for a rendering of judgment consistent with the views expressed in this opinion.
JOHNSON, J., concurs in part and dissents in part and assigns reasons.
*322 KNOLL, J., dissents in part and assigns reasons.
VICTORY and TRAYLOR, JJ., dissents in part for the reasons assigned by KNOLL, J.
JOHNSON, J., concurring in part and dissenting in part:
I join the majority in affirming the finding of medical malpractice liability on the part of Dr. Deno, but I dissent from the majority's finding that plaintiffs claim of "patient dumping" in one of medical malpractice, rather than an intentional tort. This court has already determined that "patient dumping" is governed not by the Medical Malpractice Act, but rather by general tort law. See Spradlin v. Acadia-St. Landry Med. Found., 98-1977 (La.2/29/00), 758 So.2d 116. Although the federal and state anti-dumping statute prohibit action by hospitals and not physicians, a hospital can only act through agents/employees and can be held accountable under a theory of vicarious liability.
The court of appeal correctly concluded that the Medical Malpractice Act only encompasses unintentional acts of negligence and contractual issues. It is impossible for a physician to negligently or unintentionally transfer an uninsured patient from a private hospital to a public hospital because of an inability to pay. Therefore, it is clear that plaintiffs claim for "patient dumping" falls outside the scope of the Medical Malpractice Act.
Moreover, Dr. Deno's testimony that he transferred plaintiff from JoEllen Smith to Charity Hospital because Charity has a better trauma center is clearly pretextual and not worthy of belief. Plaintiff was diagnosed with cellulitis of the arm and was not in need of trauma treatment. He simply needed to be admitted to the hospital for intravenous antibiotic treatment. Dr. Deno decided to transfer plaintiff to Charity Hospital because he determined that plaintiff could not afford to pay for inpatient treatment at JoEllen Smith, not because he wanted plaintiff to have the benefit of a superior treatment facility. He therefore made an economic and not a medical decision.
KNOLL, Justice, dissenting in part.[**]
I concur with the majority opinion finding that the lower courts erred in finding an intentional tort of "patient dumping." However, I disagree with the majority's conclusion that there was no manifest error in the jury's finding of malpractice against Dr. Deno. To the contrary, the record clearly supports that Dr. Deno was not negligent in his medical treatment of Coleman, and further, Coleman's allegations against Dr. Deno should be dismissed for lack of causation.
Plaintiffs' experts testified in a conclusory fashion that the need to amputate Mr. Coleman's arm resulted from Dr. Deno's fault. A review of the record indicates that those experts, while they conceded the possibility that Coleman's infection was the result of intravenous ("IV") drug abuse, never sufficiently explained the pathogenesis that left the muscles in his arm dead. Furthermore, plaintiffs' experts never satisfactorily addressed how the administration of antibiotics by Dr. Deno during the period when Coleman was under Dr. Deno's care would (not "could") have changed the ultimate condition of Coleman's arm. Stated simply, Coleman failed to prove the element of causation.
*323 Verily, by spreading the net of his allegations far and wide for the responsibility of his compartment syndrome which testimony showed developed within mere hours, Coleman had given himself a somewhat unique causation case to prove. Despite the short window of time in which a compartment syndrome develops, Coleman sought to fault both Dr. Sherman, who saw Coleman on June 7 when he presented with no complaint of arm pain and relayed no history of being injected with IV drugs, and Dr. Deno, who saw Coleman on June 8. However, Coleman was not diagnosed with a compartment syndrome until June 11. It was essential for Coleman to provide causation evidence that connected his compartment syndrome of June 11 to Dr. Deno who last saw Coleman on June 8. See Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228, 1229 (holding that "[a] plaintiff must also establish, with adequate evidence, however, a causal connection between a defendant's negligence and the plaintiffs injuries.") This causation evidence is woefully lacking from the record.
Not implying any disparagement of the impressive qualifications of Coleman's expert, Dr. Crane, his fields of expertise were limited to "infectious diseases and internal medicine." It must be recalled that any action or inaction by Dr. Deno was attenuated in both time and place from the onset of the compartment syndrome,[1] and the testimony of Dr. Crane as an infectious diseases specialist was speculative in the sense that Coleman had to do more than connect Dr. Deno with the loss of Coleman's arm. Coleman also had to provide the jury with a basis of opinion by which it could distinguish between any fault by Dr. Deno and Charity Hospital. See LA. CIV.CODE art. 2323. While not his burden, Dr. Deno provided the basis for the jury to draw this distinction. Of all the experts who were not involved in treating Coleman at the time of illness, Dr. Deno's expert, Dr. Nichols, an expert in surgical infectious diseases, alone provided a sufficient factual basis from which the jury could distinguish any fault among the several treating physicians, fault that was attenuated according to Coleman's own allegations. Dr. Nichols testified that Dr. Deno properly diagnosed Coleman as having cellulitis and that even when arriving at Charity, Coleman had no limb-threatening sepsis.
It is significant that Coleman's surgeon, Dr. Redmond, testified that Coleman's condition was the result of three specific strains of strep bacteria and no fault of Dr. Deno. Dr. Redmond, as the surgeon who surgically examined Coleman's arm, was the one person who could best evaluate how long before the surgery Coleman had developed the compartment syndrome. Dr. Redmond testified that based on the condition of the tissues he was examining as he explored the arm, the compartment syndrome began merely hours earlier. The record evidence clearly establishes that the compartment syndrome began on June 11, 1988, and the ultimate cause of Coleman's condition did not develop until after Coleman left Dr. Deno's care on June 8, 1988. Additionally, Dr. Redmond testified that even if Dr. Deno had started antibiotics while Coleman was under Dr. Deno's care, that would not have changed the course of Coleman's condition.
Notwithstanding, Coleman builds much of his own causation argument upon his own testimony that Dr. Deno told him that it was acceptable for him to delay reporting to Charity Hospital so he could go home and gather belongings for his hospital stay. Even if one accepts as true *324 Coleman's assertion that his delay in reporting was critical in causing the death of his arm muscles, his causation argument begins to unravel. Under Coleman's analysis of delaycausation, his own decision to delay reporting to Charity Hospital by some two and a half hours when he signed a statement acknowledging Dr. Deno's orders to go "directly" to Charity Hospital a mere ten to fifteen minutes away, was a superseding cause of his condition. Indeed, Coleman's emphasis on delay causation underscores that Dr. Deno's care and treatment were blameless.
Although there is arguably a conflict between Coleman's self-serving oral testimony and the written order to go "directly" to Charity which Coleman signed, any conflict lies completely within the element of causation for the delay, an element which Coleman had the burden to prove. Stated differently, this is not even a case where on the one hand Coleman testified that he was told that he could delay his reporting but on the other hand Dr. Deno testified that he told him otherwise. Even in such a situation, it would have been manifestly erroneous for the jury to conclude that Dr. Deno caused the delay, because the conflict between the testimony of the parties would be resolved against Coleman by his written acknowledgment. See Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989) (holding that "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness based upon a credibility determination.")
This is a case whereby Coleman's signature recognizing Dr. Deno's order to go immediately to Charity, Coleman acknowledged that he was ordered not to delay, and he later seeks to undermine his own acknowledgment. Under this court's test for finding manifest error, because Coleman is essentially contradicting himself, his delaycausation argument is even more "internally inconsistent or implausible on its face." See id.
While any one of the flaws in Coleman's arguments and his attempts to carry his burden of proof shows that the jury's verdict against Dr. Deno is insupportable, when the case is examined as a whole, one cannot realistically ignore that the verdict based upon these manifold flaws constitutes manifest error. Perhaps if the jury had found a modicum of fault on the part of Charity Hospital, the institution which Coleman himself had argued bore responsibility for failing to timely provide a surgical consult,[2] it might be possible to infer that the jury had reached a reasoned decision. Instead, the jury's finding of no fault by Charity on such clear facts to the contrary compels the conclusion that the numerous inflammatory references by Coleman to patient dumping skewed the outcome of the verdict. In short, the jury's allocation of fault, in both its positive and negative findings thereof, demonstrates that its finding of fault against Dr. Deno was based solely upon the patient dumping theory that this court today has resoundingly rejected.
Thus, finding both that plaintiffs failed to prove causation and that the apportionment of fault to Dr. Deno was based upon an impermissible theory of recovery, I conclude that the jury verdict of malpractice *325 by Dr. Deno was manifestly erroneous. For these reasons, I respectfully dissent.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] Cellulitis is an "[i]nflammation of cellular or connective tissue." Steadman's Medical Dictionary 307 (26th ed.1995).
[2] On both occasions that Coleman presented to JESH emergency room, he signed a "Conditions of Services" agreement personally obligating himself to pay for the medical services he received as an outpatient.
[3] In his deposition, excerpts of which were proffered to document the financially-based reason for the transfer, Dr. Deno explained the meaning of the latter instruction: "It means I talked to Mr. Coleman about whether or not he could afford private hospitalization. [As the patient was without funds for private hospitalization,] ... I called Charity Hospital, spoke to the charge resident in the accident room and said, `Do you have a bed to admit this gentleman.'" At trial, Dr. Deno testified that if no bed had been available at CHNO, he would have arranged for treatment at JESH.
[4] On the CHNO emergency room walk-in clinic sheet, which Coleman signed consenting to treatment, in a printed box designated "prior treatment" was written "Admission Approved," apparently confirming that Dr. Deno called and received advance approval for Coleman's transfer.
[5] Various travel times are given in the record, ranging from ten minutes to a half hour.
[6] Coleman contends that Dr. Redound's trial testimony was inconsistent with his earlier perpetuation deposition testimony. That deposition was videotaped and played to the jury at trial. Our review of that deposition reveals that on at least four occasions in the deposition Dr. Redmond expressly states that the CHNO medical record he was provided was incomplete in that it did not contain certain pathology reports.
[7] While the parties in their arguments refer to an adverse panel decision in the medical review proceeding against CHNO, no evidence of that panel decision is in the record before us.
[8] Plaintiff's supplemental and amending petition cites as the federal "anti-dumping" provision the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). The court of appeal, however, points out that "COBRA currently is known as the Emergency Medical Treatment and Active Labor Act (`EMTALA')." 99-2998 at p. 6, n. 1 (La.App. 4th Cir.4/25/01), 787 So.2d 446, 456. Likewise, the parties at trial and in arguments refer to the applicable federal provision as EMTALA.
[9] The trial court allocated that sum proportionately between Coleman and his son.
[10] With respect to Coleman's son's claim, the court of appeal held that the award of $10,000 for loss of consortium was included in the amount of the judgment above the $500,000 cap against Dr. Deno and was not allocated against the PCF.
[11] The first mention by Coleman of an intentional tort was in this court where, in an attempt to support the appellate court's creation of this new tort, he contends that Dr. Deno made a "deliberate decision" to transfer based on non-medical reasons.
[12] Given that JESH's policy was never introduced into evidence coupled with the fact that policy was not implemented until several months after Coleman presented there, we do not find this hospital policy relevant.
[13] The court of appeal did not overrule the trial court's grant of Dr. Deno's exception of no cause of action as to the EMTALA claim. Nor does Coleman contest that ruling.
[14] In Spradlin v. Acadia-St. Landry Medical Foundation, 98-1977 at p. 1, n. 1 (La.2/29/00), 758 So.2d 116, 117, we defined the term patient "dumping," noting that "[p]atient `dumping' by a private hospital generally includes the refusal to treat patients with emergency medical conditions who are uninsured and cannot pay for medical treatment or the transfer of such patients to a public hospital."
[15] In Spradlin, we discussed the nature and purpose of both EMTALA and the Louisiana statutory counterpart and the relationship between those two "anti-dumping" statutes and the MMA. Simply stated, EMTALA imposes two statutory obligations on participating hospitals; to wit (i) to provide an appropriate medical screening, and (ii) to provide individuals who are found to have an "emergency medical condition" with treatment needed to "stabilize" that condition before transferring them to another hospital or back home. To ensure compliance with those obligations, EMTALA provides a private cause of action against participating hospitals for two distinct types of dumping claims: (i) failure to appropriately screen, and (ii) failure to stabilize an emergency medical condition. Attempts to imply a private cause of action against the physician have been rejected as inconsistent with EMTALA's congressional history. Eberhardt v. City of Los Angeles, 62 F.3d 1253 (9th Cir.1995).

Similarly, the Louisiana "anti-dumping" statutory scheme, La. R.S. 40:2113.4-2113.6, establishes a duty on the part of certain hospitals to provide emergency treatment to all persons residing in the territorial area, regardless of the individual's indigence and lack of insurance. The purpose for this type state statutory scheme was to overcome the common law rule that hospitals had no duty to provide emergency treatment. Unlike EMTLA, the Louisiana "anti-dumping" statutory provisions contain no express private cause of action. On two prior occasions, we have left open the question of whether the Louisiana statutory scheme, which includes its own penalty provisions, can form the basis for a private cause of action under general tort law, La. C.C. art. 2315. Spradlin, supra; Fleming v. HCA Health Services of Louisiana, Inc., 96-1968 (La.4/8/97), 691 So.2d 1216. Today, we decline for a third time to decide that issue, which factually is not before us given the defendant in this case is not a hospital, but a physician.
[16] In several recent decisions by this court, we have classified various claims as outside the scope of the Act. In Sewell, supra, we concluded that a strict liability claim for the collapse of a bed was not malpractice. And, in Hutchinson v. Patel, 93-2156 (La.5/23/94), 637 So.2d 415, we held that the claim of a patient's wife against a hospital and psychiatrist for their alleged failure to warn or to take other precautions to protect the wife against threats of violence communicated to the psychiatrist by the patient-husband were not malpractice.
[17] Coleman relies on several broad statements made by the court of appeal in Spradlin v. Acadia St. Landry Medical Foundation, 97-845 (La.App. 3d Cir. 1/21/98), 711 So.2d 699. However, we granted certiorari in that case and repudiated in our decision in Spradlin those broad statements. First, and foremost, we noted that "[t]he statement by the court of appeal that EMTALA claims are not subject to the procedural and substantive limitations of the state malpractice act was dicta, since substantive limitations were not before the court." 98-1977 at p. 9, n. 10, 758 So.2d at 122. Second, we noted that EMTALA "does not distinguish between intentional and unintentional conduct." 98-1977 at p. 13, 758 So.2d at 120. Third, we noted that the plaintiff's separate claim against the emergency room physician for negligent diagnosis and treatment before the decision to transfer was "a matter to be addressed in the separate medical malpractice action." 98-1977 at p. 13, n. 12, 758 So.2d at 124. Finally, we noted that "[t]he statutory definition of malpractice and the federal and state prohibition against patient `dumping' often involve similar conduct." 98-1977 at p. 4, 758 So.2d at 119.
[18] Bolden was decided while Spradlin was pending before this court and simply refers to Spradlin as "not applicable." 97-1425 at p. 5, 727 So.2d at 600.
[19] As noted in an earlier footnote, plaintiff stresses that Dr. Redmond gave a perpetuation deposition for plaintiff, which was played to the jury. During that deposition, Dr. Redmond makes no reference to a compartment syndrome and did not criticize CHNO. As we noted, however, Dr. Redmond did not have a complete copy of the CHNO medical records when he gave that earlier deposition.
[**] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] While Dr. Deno treated Coleman at JoEllen Smith Hospital, an x-ray at Charity Hospital when he was admitted revealed that there was no gas in the arm tissues.
[2] Having settled with Charity Hospital, Coleman downplayed any fault of Charity. However, the settlement did not relieve the jury of its responsibility of apportioning fault to Charity. See LA. CIV.CODE art. 2323.