GREMILLION, Judge,
dissenting.
LI dissent from the majority’s opinion. I would reverse the trial court.
*567 Initially, I disagree with the majority’s contention that this matter is governed by the doctrine of law of the.case by virtue of the denial of the Authority’s application for writs. The denial was simple. There was no finding in the denial that the trial court did not err. In fact, Judge Peters concurred specifically on the basis that he would find no error on the trial court’s part. Without a determination that the trial court did not érr, a' denial of writs does not constitute law of the case. See Waller v. State, Dep’t of Health and Hosps., 11-643 (La.App. 3 Cir. 11/9/11), 79 So.3d 1085, writ denied, 11-2692 (La.2/10/12), 80 So.3d 488; In re Appeal of ANR Pipeline Co., 11-379 (La.App. 3 Cir. 8/10/11), 73 So.3d 398; Cormier v. McNeese State Univ., 13-12 (La.App. 3 Cir. 11/13/13), 127 So.3d 66.
The Billeaudeaus contend — and, presumably, the majority agrees — that negligent credentialing represents a “distinct cause of action” from the medical malpractice claim. .This cannot be, of course, because “[t]he cause of action is the state of facts which gives a party a right to judicially assert an action against the defendant.” Trahan v. Lib. Mut. Ins. Co., 314 So.2d 350, 353 (La.1975). That | ^necessarily encompasses the determination of whether the plaintiff has suffered damages. Before the alleged acts and omissions on Dr. Skirlis-Zavala’s part, the Billeaudeaus could have sustained no damage from the credentialing decision of the authority. The claim for negligent credentialing does not — logically, cannot — constitute a separate cause of action. •
Every medical malpractice' claim asserted against a health care provider that is properly qualified must be pursued subject to the terms of the • MMA. La.R.S. 40:1231,8(A)(l)(a); La.R.S. 40:1231.2(B). “Malpractice” is defined as (emphasis added): ■ • ■ - ⅛
[A]ny .unintentional tort or any breach of contract based on health care or professional services rendered,. or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.
La.R.S. 40:1231.1(A)(13). What acts or omissions constitute “malpractice” under the MMA’s definition has been extensively litigated. In my opinion, the fact that the damages were caused by alleged malpractice and not the credentialing of a physician" should end the analysis. Nonetheless, I will willing engage the majority within the context of the supreme court’s jurisprudence on this issue-.
The supreme court has provided the analytical framework within which such an analysis is to take place. In Coleman v. Deno, 01-1517, 01-1519, 01-1521, pp. 17-18 (La.1/25/02), 813 So.2d 303, 315-16, the supreme court enunciated the test (citations and footnote omitted):
lain determining whether certain conduct by a qualified health care provider constitutes “malpractice” as defined under the MMA this court has utilized the following three factors:
“[1] whether the particular wrong is ‘treatment related’ or caused by a dereliction of professional skill,”
[2]- whether, the wrong requires expert medical, evidence to determine *568 whether the appropriate standard of care was breached, and
“[3] whether the pertinent act or omission involved assessment of the patient’s condition.”
The latter annotation lists three additional factors that courts have considered, and we now add those to our Se-well list; to wit:
[4] whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,
[5] whether the injury would have occurred if the patient had not sought treatment, and
[6] whether the tort alleged was intentional.
The Louisiana Supreme Court has quoted with approval our colleagues on the Second Circuit Court of Appeal, who stated (emphasis added):
“In general, any conduct by a hospital complained of by a patient is properly within the scope of the [MMA] if it can reasonably be said that it comes within the definitions of the Act, even though there are .alternative theories of liability
Richard v. Louisiana Extended Care Ctrs., Inc., 02-978, p. 11 (La.1/14/03), 835 So.2d 460, 467-68 (quoting Rogers v. Synthes, Ltd., 626 So.2d 775, 777 (La.App. 2 Cir.1993)). Negligent credentialing is simply a'theory of liability and not a cause of action.
The first reported case that invoked the theory of negligent credentialing is Bickham v. Inphynet, Inc., 03-1897 (La.App. 1 Cir. 9/24/04), 899 So.2d 15. Bickham was a case that arose before the MMA’s definition of “malpractice” was |4amended to include “acts of omissions in the training or supervision of health care providers.” See 2001 La. Acts No. 108. The majority of the court found that the claim for negligent credentialing fell outside the scope of the MMA. In dissent, then-Judge Guidry, writing for himself and four other judges, observed; correctly, in my opinion:
In order for Mr. Bickham to prove the tort of negligent credentialing, he.must first establish that a negligent act of Dr. Yacoub proximately caused his injury before he can proceed against Riverside. As a result,, it is inappropriate to look only to the credentialing conduct alleged in the complaint to determine whether it sounds in malpractice or in ordinary negligence. The credentialing process alleged must have resulted in a definable act of medical malpractice that caused damage to Mr. Bickham or Mr. Bickham would be without a basis to bring the suit against Riverside. See Armand, 97-2958 at p. 10, 729 So.2d at 1090; Williams, 00-0365 at pp. 1-2, 801 So.2d at 464-465 (Guidry, J., dissenting); Winona Memorial Hospital v. Kuester, 737 N.E.2d 824, 828 (Ind.App.10/24/00). Therefore, when examining these two acts together, it is clear that the credentialing conduct directly impacts, involves, and is related to the treatment received by Mr. Bickham, and as such, is related to the provision of health care.
Bickham v. Inphynet, Inc., 03-1897, p. 18 (La.App. 1 Cir. 9/24/04), 899 So.2d 15, 18. The act of credentialing does not cause damage; it is the act qr omission alleged against the health care .provider that causes damage.
The first circuit reached a similar conclusion in a second pre-2001 case, Eusea v. Blanchard, 04-1855 (La.App. 1 Cir. 2/11/05), 899 So.2d 41, which also, like Bickham, involved allegations of negligent supervision and training in addition to negligent credentialing.
*569 In Dinnat v. Texada, 09-665 (La.App. 3 Cir. 2/10/10), 30 So.3d 1139, writ denied, 10-540 (La.6/18/10), 38 So.3d 322, this court found that a claim for “negligent credentialing” was actually a claim for negligent. supervision. Accordingly, we granted writs and peremptorily reversed the trial court judgment | ¿denying an exception of prematurity on the basis that such a claim was not required to be presented to a medical review panel.
In Plaisance v. Our Lady of Lourdes Regional Medical Center, Inc., 10-348 (La.App. 3 Cir. 10/6/10), 47 So.3d 17, writ denied, 10-2520 (La.1/14/11), 52 So.3d 904, this court engaged in an exhaustive examination of each of the Coleman factors to determine whether a claim for “negligent credentialing^ constituted a malpractice claim. In the final analysis, this court concluded that the claim was subject to the MMA. Thus, .for the first time since the MMA was amended to include physician oversight issues within the definition of “malpractice,” a court has concluded that such a claim is not subject to the MMA.
The Billeaudeaus complain that the Authority negligently eredentialed Dr. Skir-lis-Zavala in the following respects, as asserted in their- motion for partial summary judgment:
Based upon information obtained during discovery in the panel phase of this suit, the Billeaudeaus brought a credible negligent credentialing claim against OGH concerning its credentialing of Dr. Zavala — a physician who attended medical school in Mexico, obtained a family practice certification in 2005, began working in Louisiana emergency departments in 2006, and by the time of her application for emergency department privileges to OGH in 2009, had racked up not one, but two medical malpractice complaints that had resulted in settlements.
It is clear that Plaintiffs’ [sic] have a medical malpractice action subject to the LMMA concerning Dr. ; Zavala’s care and treatment.' However, their claim of negligent credentialing against OGH is not subject to the LMMA. Pertinent to the Court’s analysis id the Plaintiffs’ 'Petition for Damages, which alleges:
• Dr. Zavala completed a residency in family practice in 2005 and has been working with the Schumacher Group since 2006. She is not a board-certified-emergency medicine physician. Prior to this incident, she had diagnosed, stroke on only five other occasions. Also, prior to this incident, she] shad administered tPA in the emergency department on only two other occasions.
• Defendant, Opelousas General Hospital, it’s liable unto Petitioners because Ms. Billeaudeau’s injuries, and damages, which will be specified hereinafter, were proximately and legally caused by the fault, including negligence, of Opelousas General Hospital and its officers, agents, employees and those for whom it is legally, responsible, including the following negligent acts of omission and commission, among others, which may be shown during the trial; ... (e) Negligent credent tialing of Dr. Zavala.

[1] Whether the particular wrong is “treatment related” or caused by dereliction of professional skill

The Billeaudeaus focus on Dr. Skirlis-Zavala’s relative inexperience in emergency medicine and stroke diagnosis in particular. They also point to her attendance at a Mexico medical school instead of one located in the United States, and on Dr. Skirlis-Zavala’s two malpractice claims, which were asserted before she applied for *570 privileges at Opelousas General. Unlike the demands in Plaisance, these assertions relate to conduct that occurred before Dr. Skirlis-Zavala was granted privileges at Opelousas General, and,' thus, are not “treatment related” per the Coleman analysis. I agree with the. majority on this point.

[2] Whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached

In Plaisance, the wrong alleged against the hospital included allegations that the hospital’s response to the doctor’s “alleged deficient performance of medical procedures” was inadequate or negligent. Id. at 22. We found, “It follows that expert medical evidence would be required to determine whether Dr. Beauregard was qualified to perform the medical procedures, whether he committed ^malpractice, and whether that malpractice necessarily created a duty on the hospital to take action.” Id. This matter will be no different, whether one is asking whether a hospital is required' to take action to suspend a doctor’s privileges in light of alleged malpractice after his privileges have been extended or, as in the present case, the issue involves claims against the doctor before the privileges have been extended. Because expert testimony is required, an analysis of the second Coleman factor would indicate that" this matter sounds in malpractice.

[3] Whether the pertinent act or omission involved assessment of the patient’s condition

An analysis of the hospital’s credentialing methods as they relate to Dr. Skirlis-Zavala does not require any assessment of Ms. Billeaudeau’s condition. . This factor mitigates against considering this a malpractice matter.

[4] Whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform

In Plaisance, this court stated:
The plaintiffs’ petition alleges that Lourdes was aware of certain negligent acts of Dr. Beauregard “yet failed to suspend or revoke [his] privileges.” Louisiana Revised Statutes 40:2114(E) provides that “[a] hospital shall establish rules, regulations, and procedures setting forth the nature, extent, and type' of staff membership and clinical privileges, as well as the limitations placed by the hospital on said staff membership and clinical privileges for all health care providers practicing therein.” Thus, Lourdes’s action or inaction regarding Dr. Beauregard’s privileges is within the scope of activities a hospital is licensed to perform, and the fourth factor is satisfied. See Dinnat v. Tezada, 09-665 (La.App. 3 Cir. 2/10/10), 30 So.3d 1139, writ denied, 10-540 (La.6/18/10), 38 So.3d 322.
Every credentialing decision a hospital makes would be subject to the MMA were only this factor considered.
| s/57 Whether the injury would have occurred if the patient had not sought treatment
As in Plaisance, the injuries Ms. Bil-leaudeau sustained would not have happened had she not been treated by Dr. Skirlis-Zavala, according to the petition filed by the Billeaudeaus. Again, this factor mitigates in favor of the matter being considered subject to the MMA.

*571
[6] Whether the tort alleged was intentional

There has been suggested nothing to indicate that the- alleged tort was intentional. .
It appears, then, that of the six factors listed in Coleman, four factors — 2, 4, 5, and 6 — dead to the conclusion that the Billeaudeau’s claim for negligent credentialing of Dr. Skirlis-Zavala is a malpractice claim and subject to the MMA.
Thus, not only the Plaisance, Dinnat, and Eusea decisions, but also Coleman, provides judicial objections to the majority’s view. But, 'my disagreement with my colleagues comes from an even more fundamental place: basic logic. Moreover, the rationale articulated in Coleman forces us to ask some questions. Assume that the factfinder determines to a certainty that a hospital DID negligently credential a doctor, but also that the same factfinder finds that the same doctor DID NOT commit medical-malpractice.
• How much should the plaintiff recover from the doctor who DID NOT commit malpractice on her?
• How much should the plaintiff recover from the hospital under whose roof she lay as she WAS NOT subjected to malpractice?
• What is the proper penalty for credentialing a doctor who treats his or her patient properly and who DOES NOT fall below- the appropriate standard of care?
b* Where is the necessary connection between the alleged liability and the alleged damage?
Of course, the answer to each of these questions is NOTHING AT ALL. No recovery. No penalty. No connection. To reach another conclusion would defy logic. Such a conclusion would also extend a cause of action to every single patient the doctor ever treated at the hospital, completely regardless of the. question of the doctor’s alleged malpractice.. Simply allowing a bad doctor access to patients at your hospital, without more, gets, a plaintiff nowhere., It is only when that bad doctor does bad things to a patient, and those bad things result in damages, that a patient may recover. That is what the Coleman court and the Plaisance court both recognized. The majority should have recognized it as well.

Legislative intent

Lastly, the majority claims that the legislative’s rejection of credentialing as a matter covered by the MMA expresses the legislature’s,intent that credentialing not be covered by the Act. Again, I disagree. It simply does not logically follow that because the legislature excluded language specifically including credentialing from the Act, the legislature intended for credentialing to not be covered (particularly when one considers the aíl-encompassing language the Act employs in defining malpractice); one can just as easily conclude that the legislature felt that such an amendment was unnecessary, because the act of hiring an employee is an act of supervision of the employee.
I would reverse the trial court.