CARAWAY, J.
hA 94-year-old filed suit in district court against the nursing home where she resided, raising claims that allegedly fell outside the Louisiana Medical Malpractice Act, including intentional injury. The defendant nursing home filed an exception of prematurity, alleging that the claims must first be presented to a medical review panel. After the trial court granted the exception without prejudice, pending review of plaintiffs’ complaint of medical malpractice by a medical review panel, this appeal ensued.

Facts

At 6:45 a.m. on March 16, 2014, 94-year-old Jessie Stephenson was a resident of The Glen Retirement System d/b/a Village Health Care at the Glen (“The Glen”) when she fell out of her bed that had been placed in the highest position by a certified nursing assistant (“CNA”). Stephenson suffered bilateral femoral fractures that led to the amputation of one of her legs.
Following the fall, Stephenson was placed back -into her bed without her injuries being immediately recognized. At 8:43 a.m., on March 16, 2014, an LPN on duty found that Stephenson began to complain of bilateral hip pain and could not be turned on either hip. At 1:47 p.m,, a physician notified of Stephenson’s pain, ordered a mobile x-ray of her hips and knees. When the x-rays revealed femoral fractures in both legs, Stephenson was transported; to a hospital.
|aOn March 11,2015, Stephenson[1] filed a petition for damages in district court rais *488 ing claims of intentional tort and breaches of fiduciary duty and contract by The Glen. Stephenson also filed with the Louisiana Division of Administration a request for a Medical Review Panel (“MRP complaint”) on February 20, 2015, seeking review of her complaint against The Glen asserting that certain claims filed in district court fell outside the Louisiana Medical Malpractice Act (“MMA”). The Louisiana Patient’s Compensation Fund confirmed that The Glen was qualified for acts of medical malpractice under the MMA.
Relating to the fall and the alleged intentional acts of The Glen employee, the petition included the following allegations:
13. Further, it is specifically shown that on or about March 16, 2014, Jessie L. Stephenson was allowed to suffer severe injury at the hands of the defendant’s care givers staff and was intentionally placed back in the bed without notification of the injury to her physician, a registered nurse or family.
14. This intentional injury, and/or injury with intentional action of placing the patient in the bed after injury without notification of the patient’s family or physician and registered nurse falls outside the Medical Malpractice Act.
15. Moreover, it is shown that the nursing staff of The Glen Retirement System placed her bed in the highest position and without fall precautions, despite knowing that she was at high risk for falling and injury. This placed Mrs. Stephenson in a dangerous and hazardous position which defendant[’]s agents and employees knew was improper.
The Glen filed an exception of prematurity on April 2, 2015, arguing that “plaintiffs’ allegations squarely fall within the parameters of malpractice.” Attached to the exception were copies of both the district Iscourt petition and the MRP complaint. While substantially duplicative of the petition filed in district court, the MRP complaint added the following:
11. Mrs. Jessie Stephenson was admitted pursuant to her physician’s order to defendant’s facility for skilled care and services to be provided to maintain and attain the highest practicable care for her physical, mental and psycho social needs.
12. It is shown that at the time of her admission to defendant[’]s care, Jessie Stephenson was ambulatory with assistance and suffered from a number of diseases which inquired close monitoring and assistance, including dementia with behavioral disturbance, heart condition, and other illnesses requiring skilled professional care and services 24 hours per day.
13. Jessie Stephenson suffered a number of falls while a patient in defendant’s facility and her needs for close supervision, monitoring and need for a specialized comprehensive care plan to prevent falls and injuries was well known to the defendant’s agents and employees.
14. It will be shown that in March, 2014, Jessie L. Stephenson was noted to suffer repeat falls and incidents wherein she was found on the floor. The nursing staff was aware of her potential for injury, her high fall risk, and her inability to have safety awareness due to her disease processes, her dementia and inability to control her impulsive behavior associated with her disease and illness.
15. Further, it was clear that the nursing staff was to closely supervise, monitor and check on Jessie L. Stephenson due to her high risk of falling, and was to place her in a low bed with mats, utilize a bed alarm and implement other *489 interventions to prevent falls and injuries.
16. [O]n or about March 16, 2014, Mrs. Jessie L. Stephenson was allowed to suffer injury when found on the floor next to her bed with her bed in the highest position and without these fall precautions being utilized.
17. It is shown that Mrs. Stephenson was placed back in the bed without proper assessment nor notification to her family, physician, nor registered nurse.
Stephenson opposed the exception arguing that the petition claims fell outside the MMA as the acts alleged were “intentional and custodial in nature.” The Glen submitted a reply memorandum in support of the 14exception and attached nursing home records including nurses’ notes that documented the events of March 16, 2014. These records were allowed as evidence for the trial court’s consideration of the exception.
At the hearing on the exception, counsel for The Glen argued that both Stephenson’s fall risk interventions and her assessment after the fall qualified as treatment under the MMA. Counsel for Stephenson argued that “there was an intentional injury by the nursing assistant, and that the intentional placing back and covering up,” qualified as an intentional injury beyond the scope of treatment. She also argued that the intentional acts included placing the bed in this highest position and that any acts of negligence were custodial in nature. On June 24, 2015, a written judgment granting the exception was signed by the court. This appeal by Stephénson ensued.

Discussion

On appeal Stephenson reurges her arguments made at the hearing on the exception. The issues for resolution are whether Stephenson has alleged an intentional tort and/or whether the claims sound in custodial negligence so as to fall outside of the parameters of the MMA.
La. C.C.P. art. 926 provides for the dilatory exception raising the objection of prematurity. The exception of prematurity addresses the issue of whether a judicial cause of action has yet come into existence because a prerequisite condition has not been fulfilled. LaCoste v. Pendleton Methodist Hosp., L.L.C., 07-0008 (La.9/5/07), 966 So.2d 519; Heacock v. Cook, 45,868 (La.App.2d Cir.12/29/10), 60 So.3d 624. See also, Dupuy v. NMC Operating Co., 15-1754 (La.3/15/16), 187 So.3d 436.
The dilatory exception of prematurity is the proper procedural mechanism for a qualified health care provider to invoke when a medical malpractice plaintiff has failed to submit the claim to a medical review panel before filing suit against the provider. Henry v. West Monroe Guest House, Inc., 39,442 (La.App.2d Cir.3/2/05), 895 So.2d 680. The exception of prematurity neither challenges nor attempts to defeat the elements of the plaintiffs cause of action; instead the defendant asserts the plaintiff has failed to take some preliminary step necessary to make the controversy ripe for judicial involvement. Dupuy, supra; LaCoste, supra.
At a contradictory hearing on an exception, evidence is admissible to resolve the exception. La. C.C.P. art. 930; SteriFx, Inc. v. Roden, 41,383 (La.App. 2 Cir. 8/25/06), 939 So.2d 533. If evidence is admitted at such a hearing, the exception must be resolved on the evidence presented, rather than on the allegations in the petition. SteriFx, supra. The trial court’s factual findings underlying the decision are reviewed under the manifest error standard of review. Id.
*490 Malpractice is defined under the MMA in relevant part as any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient.[2] |fiLa. R.S. 40:1231.1(A)(13); La. R.S. 40:129.9.41(A)(8). Thus, by definition, malpractice does not include the intentional acts of the health care provider. Heacock, supra. Health, care means any act.or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient’s medical care, treatment, or confinement, or during or relating to or in connection with the procurement of human blood or blood components. La. R.S. 40:1231.1(A)(9); La. R.S. 40:1299.41(A)(9). Heath care provider includes a certified nurse assistant. La. R.S. 40:1231.1(A)(10); La. R.S. 40:1299.41(A)(10).
Also under the MMA, tort means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional Services or health care to . a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill. La. R.S. 40:1231.1(A)(22); La. R.S. 40:1299.41(A)(7).
The Louisiana Supreme Court has steadfastly emphasized that the MMA and its limitations on tort liability apply only to claims arising from medical malpractice, and that all other tort liability on the part of the qualified health care provider is governed by tort law. LaCoste, supra. This is because the MMA’s limitations on the liability of health care 17providers were created by special legislation in derogation of the right of tort victims'. Id. In keeping with this concept, any ambiguity should be resolved in favor of the plaintiff and against finding that the tort alleged sounds in medical malpractice. Id.
In Coleman v. Deno, 01-1517 (La.1/25/02), 813 So.2d 303, the Louisiana Supreme Court set forth a six-part test for determining whether a negligent act by a qualified health care is covered by the MMA;
1) whether the particular wrong is treatment related or caused by a dereliction of professional skill;
2) whether the wrong requires . expert medical evidence to determine whether the appropriate standard of care was breached; '
3) whether the pertinent act or omission involved assessment of the patient’s condition;.
4) whether an incident occurred in the context- of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform;
5) whether the injury would have occurred if the patient had not sought treatment; and
6) whether the tort alleged was intentional.
In. the jurisprudence, situations where patients have fallen from wheelchairs have been classified by the courts as involving the handling, loading and unloading of a patient which comes' directly’ under the *491 MMA’s definition of malpractice. Thomas v. Nexion Health at Lafayette, Inc., 14-609 (La.App. 3d Cir.1/14/15), 155 So.3d 708, writ denied, 15-0311 (La.4/24/15), 169 So.3d 359. However, a hospital’s alleged negligence in failing to repair a wheelchair and in failing to make sure that the wheelchair was in proper working condition pri- or to returning it to service was not subject to MMA when the patient fell from the chair. Williamson v. Hospital Serv. Dist. No. 1 of Jefferson, 04-0451 (La.12/1/04), 888 So.2d 782. Likewise, in a case where a nursing home resident was not receiving | ¿¡medical care when she fell out of a wheelchair, the court held that claim was not governed by the MMA. Pender v. Natchitoches Parish. Hosp., 01-1380 (La.App. 3d Cir.5/15/02), 817 So.2d 1239.
The court in Hamilton v. Baton Rouge Health Care, 09-0849 (La.App. 1st Cir.12/8/10), 52 So.3d. 330, addressed a nursing home situation where a patient required total around-the-clock care. The court observed that while the nursing home “úndoubtedly had routine custodial duties” toward the patient, the nursing home care occurred “in the overall context of the health care provider-patient relationship, given the patient’s need for total nursing'care.” With the alleged accident involving’ the patient’s transfer from a wheelchair into bed, the court ruled that an MMA claim was alleged.-
This fact-sensitive measure of alleged claims led to the unique ruling by the Louisiana Supreme Court in Blevins v. Hamilton Medical Center, Inc., 07-127 (La.6/29/07), 959 So.2d 440. There the court found- that three of the plaintiffs ten claims against a -hospital sounded in general negligence and severed the nonmedical claims from- the medical malpractice ones. The non-medical claims in Blevins involved the patient’s injuries received when he fell from a bed that rolled as he attempted to get out of the bed without the assistance of any hospital employee. The plaintiff alleged that the bed was either defective or someone did not lock the bed down as he should have. Other claims concerned the unspecified conduct of those individuals who participated in the plaintiffs medical care during his hospitalization.
' | ¡Applying the Coleman factors, the Blevins court concluded that the “furnishing of equipment not in proper working order, has nothing to do with the condition and associated treatment for which plaintiff was hospitalized,” and that “these two separate and distinct events occurred independently of each other.” Further, the court concluded that in that case, “the locking or securing of a bed is something that is routinely performed by maintenance or housekeeping personnel or nurse’s aides,” and thus the “failure to properly lock a bed [did] not result from any dereliction of professional skill that' is treatment-related for the. patient.” It was determined that no expert testimony was required, that the locking of the bed did not involve assessment of the patient’s condition-and that the alleged incident did not occur in the context of a physician-patient relationship or within the scope of hospital activities. ‘ Finally, the court’ found that the injury sustained “was a completely independent injury- from the condition for which the plaintiff sought treatment,” and was not intentional. Specifically the court ruled that:
[T]he application of the Coleman factors demonstrate that the failure to provide a patient with equipment in proper working condition, to keep a patient’s bed- in the lowest position with the wheels •locked, and to properly instruct a patient on proper use and safety with regard to his bed sound in general negligence ' as the wrongs' alleged are not *492 integral to the rendering of care and treatment by the health care provider to the patient in this case.

Id.

Justice Weimer dissented in Blevins finding that the “plaintiffs three other allegations also fall within the medical malpractice act and that all the allegations are so intertwined with each other than the entire matter should be referred to a medical malpractice panel for review.” Id. The Justice | inreasoned that failure to provide a patient with equipment in proper working condition, to keep a patient’s bed in the lowest position with the wheels locked, and to properly instruct a patient on proper use and safety with regard to his bed “all implicate personnel at the hospital and specifically allege their failure to act.”
Regarding intentional torts, the meaning of intent is that the person who acts either 1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or 2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act rather than to the act itself. Act is distinguished from intent in that the word act is used to denote an external manifestation of the actor’s will which produces consequences. That act must proceed from volition of the actor. 1 William E. Crawford, Tort Law, § 12:4 in 12 Louisiana Civil Law Treatise (2d ed. 2009). For example, terms such as “should have known” may raise issues of negligence or gross negligence, but do not amount to “intentional” as that term is used in the Worker’s Compensation Act. Id, citing Adams v. Time Saver Stores, Inc., 615 So.2d 460 (La.App. 4th Cir.1993), writ denied, 617 So.2d 910 (La.1993).
In this case, the defense evidence was allowed on the exception without objection from the plaintiffs. Therefore, the exception must be resolved on the evidence presented, to the extent certain allegations of the petition were challenged by that evidence. In these circumstances, we give hithe factual findings of the trial court deference and review those findings under the manifest error standard of review.
Regarding the intentional acts at issue, the plaintiffs allege that Stephenson was intentionally placed back in the bed with knowledge of the injury and without notification either to her physician, a registered nurse or her family. Those intentional acts were alleged to fall outside the MMA. Further, plaintiffs allege that the second intentional act of the nursing staff was the placing of Stephenson’s bed in the highest position without fall precautions, despite knowing that she was at high risk for falling and injury.
The Glen included medical documentation in support of the exception. The documents included a four page Discharge/Transfer Summary, three pages of Nurses Notes and a Risk Fall Assessment. In relevant part, those documents include the following facts:
• Stephenson’s Discharge/Transfer Summary of March 16, 2014 (1:53:49 PM), was created by Virginia Huff, LPN, and noted the following:
Res had fall this AM prior to this nurse coming on duty with no c/o pain at that time. When this nurse went to room, res c/o pain to bilateral knees. Res could not tolerate being rolled over onto side & HOB could not be raised without resident screaming out in pain “I can’t take it!!!” Repeatedly. Mobile xray confirmed bilateral knees=impacted distal femoral FX’s.
*493 • A medical history included in the Discharge/Transfer Summary and prepared by LPN B. Counts, LPN MDS Coordinator/Case Manager. The medical history indicated the following:
[O]n 3-16-14 early am hours HS nurse reported summoned to room by C.N.A. Res found lying on left side on floor mat closest to window. Resident’s bed reported in highest position with HOB and foot of bed slightly elevated the control to elevate bed was hanging off the side rail of the bed closest to window. Her side rails reported up x 2 for assist, resident reported assessed from head to toe, and no reported injury | ^observed or reported, resident denied pain and shook head when asked if in pain with no reported facial grimacing, and resident reported confused voicing look'ing for Adalyn. Later in same day resident had voiced onset of bilateral leg/knee/hip pain that am, unable to stand nor able to be turned on her side, and Iris house reported unable to raise HOB w/o resident screaming out in pain.
• Nurses Notes from 8/13/2014-3/16/2014 contained the following relevant notations:
3/16/2014 Morning Shift
1:47:27 PM (prepared by Virginia Huff, LPN)
Res had fall early this AM prior to this nurse coming on shift <& had no c/o pain at that time. Res has approx. 3 inch scratch to right chest, right 2nd and 3rd toes with bruising. Approx. 2 cm skin tear to right elbow. Res c/o bilateral leg/knee/hip pain this am. Res could not stand to be turned on side & HOB could not be raised without res screaming out in pain “I can’t take it!!!” Repeatedly. MD notified of c/o pain. New orders obtained to xray bilateral hips & knees.
3/16/2014 Morning Shift
6:26:22 PM (prepared by Cabarubio,
Natasha K. LPN)
Report of Incident: Date: 3/16/2014 Time: 6:45 AM
Description: Writer summon[ed] to resident’s room by CNA Alice Hall. Resident found lying on left side on floor mat closest to window. Resident’s bed was in the highest position with HOB and foot of bed slightly elevated. The control to elevate bed was hanging off of the side rail of the bed closest to the window. Side rails up x 2. Resident assessed from head to toe. No apparent injury noted. ROM appropriate for resident. Resident assisted back to bed using two person assist. Resident then turned from side to side. Skin intact and not new skin issues noted. Resident denied pain and shook head no when asked if there was any pain present. No grimacing noted. Resident stated, “I’m looking for Adalyn.”
Injuries: No Apparent Injury
Interventions: Ensure Bed in lowered before staff exits the resident’s room. Resident statement: “I’m looking for Adalyn”
Prescriber Notified (Date-Prescri-ber): 3/16/2014 6:45:00 AM — Henry, David T.
11S* Stephenson’s Fall Risk Assessment from March 16, 2014, prepared by Bryan Counts, LPN, indicated that as of that date, she had fallen 1-2 times in the past three months, took several medications and had 3 or more predisposing diseases.
The allegations and evidence presented on the exception of prematurity established the following facts. Despite plain *494 tiffs allegations5 and argument that Stephenson was placed back into her bed by the CNA, who, “with the conscious goal of avoiding detection, chose to pick Ms. Stephenson back up and put her back in her bed,” failed to notify or document anyone of the incident, the evidence submitted by The Glen refutes these claims. The Glen documéntation indicates that the CNA summoned an LPN who evaluated Stephenson from head to toe and that both employees placed the resident, who then complained' of no pain, back into her bed. Those notes also indicate that the LPN then notified Stephenson’s physician of the incident. While these, notes were admittedly generated on the evening following the visit, plaintiffs allowed the hospital documentation to be introduced into evidence for the trial court’s' ruling on the exception without contrary evidence or cross-examination of the hospital staff.
Secondly, The Glen concedes that the bed was in the highest position and that interventions were put in place to assjire that the bed was in the lowest position before the staff exited the room. Before the fall occurred, the bed was to have been placed in a lower position with complete guard protection.. This was the plaintiffs allegation and the evidence presented did not dispute the necessity of such precaution.
| uFrom this review of the evidence, we find that The Glen successfully disputed the claim of intentional tort regarding the placement' of Stephenson back in the bed after her fall. The trial court could therefore reach thé conclusion of no intentional tort as a ‘factual assessment which is not clearly wrong. Likewisé, the primary claim regarding the failure to position the bed relates in our opinion to the negligent rendering of care and the assessment of the patient’s condition and. is not merely a custodial act claim. Accordingly, under Coleman, supra and the cited jurisprudence, the ■ trial court’s granting of ■ the exception of prematurity is affirmed.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Appellants.
AFFIRMED.
BLEICH (Ad Hoc), J., concurs with written reasons.

. The petition also named as plaintiffs Mesc-hell White, the legal representative of Ste *488 phenson, and Linda Livingston, Stephenson's daughter and responsible party.

. The Louisiana MMA was numerically redes-ignated effective August 1, 2105, For purposes of this opinion, both referenced citations will be given.