Judgment rendered August 9, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,130-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

CRYSTAL SELF,                                      Plaintiffs-Appellants
INDIVIDUALLY, AND TODD
SELF, INDIVIDUALLY, AND ON
BEHALF OF THEIR MINOR
CHILDREN, CORA SELF AND
CARSYN SELF

versus

WILLIS-KNIGHTON MEDICAL                            Defendants-Appellees
CENTER D/B/A WILLIS-
KNIGHTON PIERREMONT
HEALTH CENTER, STATE OF
LOUISIANA THROUGH THE
BOARD OF SUPERVISORS OF
LOUISIANA STATE
UNIVERSITY AND
AGRICULTURAL AND
MECHANICAL COLLEGE, ON
BEHALF OF LSU HEALTH
SCIENCES CENTER-NEW
ORLEANS, BHARAT
GUTHIKONDA, M.D., DAVID
STEVEN GREEN, M.D., AMY
ALISE FONTENOT, P.A.,
LOUISIANA MEDICAL MUTUAL
INSURANCE COMPANY,
PULMONARY & CRITICAL
CARE SPECIALISTS, LLC,
JASON DEEN NELSON, M.D.,
AND CONTRACTED
PHYSICIANS OF WKMC

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 635,165

Honorable Ramon Lafitte, Judge

* * * * *

THE TOWNSLEY LAW
FIRM, LLP
By: Jordyn A. Goody

Counsel for Appellants


JEFF LANDRY
Attorney General

MARGARET E. RICHIE GASKINS
JEANNIE C. PRUDHOMME
Assistant Attorneys General

Counsel for Appellees,
State of Louisiana,
through the Board of
Supervisors of Louisiana
State University
Agricultural and
Mechanical College, on
behalf of LSU Health
Sciences Center-New
Orleans, and Bharat
Guthikonda, M.D.


WATSON, BLANCHE, WILSON
& POSNER
By: Robert W. Robison, Jr.
     Colin T. Munn

Counsel for Appellees,
Willis-Knighton
Pierremont Health
Center and Jason D.
Nelson, M.D.


PUGH, PUGH, PUGH, LLP
By: Robert G. Pugh, Jr.

Counsel for Appellees,
Louisiana Medical
Mutual Insurance
Company, Pulmonary &
Critical Care Specialists,
LLC, and David S.
Green, M.D.


PETTIETTE, ARMAND,
DUNKLEMAN, WOODLEY
& CROMWELL, LLP
By: Lawrence W. Pettiette, Jr.
     Joseph S. Woodley

Counsel for Appellee,
Amy Alise Fontenot,
P.A.


\* \* \* \* \*


Before STEPHENS, THOMPSON and ELLENDER, JJ.

**THOMPSON, J.**

Before us is the tragic situation of a young wife and mother of two, whose brain surgery and subsequent medical treatment allegedly resulted in her quadriparesis and other devastating permanent injuries. The mother and her husband, on their own behalf and that of their two children, filed suit against her various health care providers, alleging that their claims arise under a theory of intentional tort, rather than simply medical malpractice. The health care providers filed exceptions of prematurity, arguing that the suit was premature because her claims sound in medical malpractice rather than intentional tort. The district court agreed and dismissed all claims against the health care providers. For the foregoing reasons, we affirm the judgments of the district court and direct plaintiffs to seek remedy under the theory of medical malpractice.

## FACTS AND PROCEDURAL HISTORY

On January 29, 2021, Crystal Self ("Self"), a 38-year-old married mother of two, saw Dr. Bharat Guthikonda for headaches and because she had an MRI in May of 2020 that showed a Chiari I Malformation.[1] Dr. Guthikonda found a ping pong ball-sized nodule located where her cerebellum met her spinal cord and told Self that the Chiari I Malformation was likely caused by the swelling from the nodule. He recommended surgery to remove the mass. On February 8, 2021, Self had a suboccipital craniotomy performed by Dr. Guthikonda at Willis-Knighton Medical Center, d/b/a Willis-Knighton Pierremont Heath Center ("Willis Knighton"),

---

[1] A Chiari I Malformation is a condition where the cerebellum bulges through the normal opening at the base of the skull.

to remove the mass in her brain. When her family visited her after the surgery, Self was awake, alert, and smiling. The basis of the instant lawsuit is the treatment Self allegedly received over the following days and weeks from various nurses and doctors.[2]

Self alleges that five nurses provided her with ICU nursing care between the morning of February 8, 2021, and the evening of February 10, 2021. She alleges that the Willis Knighton nurses did not perform a proper assessment of her pain, perform proper neurological checks, develop a proper nursing care plan, or follow doctor's orders for strict blood pressure control. For example, Dr. Guthikonda ordered that he be notified if her heart rate dropped below 60, but Self alleges that nurse Allisha Brown lowered her pulse rate alarm to 40 and lowered the low O2 sat alarm to 88. Nurse Brown did not contact Dr. Guthikonda about Self's low heart rate and did not advise him that she had lowered the heart rate alarm below the level he ordered.

While at Willis Knighton, Self was treated by Dr. David Green and his physician assistant, Amy Fontenot ("Fontenot"), who are both employees of Pulmonary and Critical Care Specialist ("PCCS"). Self was also treated by Dr. Jason Nelson, a hospitalist with Willis Knighton. Self details her inability to do physical therapy over the next several days following surgery because of her lethargy, vomiting, and severe headache. She states that none of the above doctors or Fontenot ordered additional diagnostic imaging or labs despite her condition worsening.

---

[2] As noted below, for the purposes of the disputed exception of prematurity, the court has assumed all facts pled in Self's petition as true. *LaCoste v. Pendleton Methodist Hosp., LLC*, 07-0008 (La. 9/5/07), 966 So. 2d 519.

2

The evening of February 10, 2021, while still a patient at Willis Knighton, Self's mother noticed Self was not breathing and a code blue was called. Self was intubated and a CT scan of her brain was performed. Dr. Guthikonda was in her ICU room that evening but made no notes of his visit. Two attempts were made to place a ventriculostomy drain,[3] but there is no documentation of what time the drains were attempted or the outcome of the final drain placement. Dr. Guthikonda performed a second surgery the evening of February 10, 2021 to decompress her posterior fossa and perform a craniectomy.[4] Self contends that the ICU nurse on duty after her second surgery did not document anything about the drain, the infusion, and many other aspects of her care during his nine-hour shift. She argues that a proper neurological check did not occur until nine hours after her second surgery.

A CT scan performed February 12, 2021 indicated that Self had a cerebrospinal fluid[5] ("CSF") leak that she argues remained untreated while at Willis Knighton. Self also alleges that the staples placed during her second surgery were not removed from her posterior neck incision until five weeks after the surgery, on March 19, 2021. On April 1, 2021, a nurse called Dr. Guthikonda because her neck incision was leaking, and he placed a small stitch at the base of Self's skull in an attempt to address the leak.

On April 9, 2021, 60 days after her initial surgery, Self was transferred to a rehabilitation facility in Houston, Texas. Upon her arrival,

---

[3] A ventriculostomy drain is a temporary system that allows drainage of cerebral spinal fluid from the ventricles to an external closed system, in order to alleviate intracranial pressure.

[4] A craniectomy is a type of surgery to remove a portion of the skull to relieve extra pressure on the brain.

[5] CSF is the fluid that flows in and around the hollow spaces of the brain and spinal cord.

the doctors and staff at the rehabilitation facility determined that she was febrile, tachycardic, had left side pneumothorax, leukocytosis, and had multiple pressure sores. Her pillow was soaked with CSF fluid that had likely been present since the stitch was placed in her neck incision eight days earlier. She was transferred to a hospital in Houston, Texas, where a chest tube was placed to treat her pneumothorax. She was also diagnosed with sepsis secondary to the CSF leak and required the placement of a lumbar drain. It was also discovered that she had several intra-abdominal abscesses caused by a leaking PEG tub.

Plaintiffs' petition includes numerous allegations detailing serious complications that may have been avoided with attentive care. Plaintiffs allege that due to the willful, deliberate, and intentional choices made by the defendants, Self now suffers from quadriparesis, remains with a tracheostomy, requires a feeding tube for nutrition, and does not communicate. They allege that her care following her surgery and brain injury led to the development of preventable pressure ulcers, ongoing infections, and her inability to return home.

On February 8, 2022, Self, her husband, Todd Self, and on behalf of her children (collectively, "plaintiffs") filed a petition, making the above allegations and seeking damages against Dr. Guthikonda, Willis Knighton, the State of Louisiana, through the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, on behalf of LSU Health Sciences Center-New Orleans, Dr. Green, Fontenot, PCCS, Louisiana Medical Mutual Insurance Company ("LAMMICO"), Dr. Nelson, and Contracted Physicians of WKMC (collectively, "defendants"). The

defendants filed several dilatory exceptions of prematurity, arguing that plaintiffs' claims sound in medical malpractice and are thus premature until the claims have been reviewed by a medical review panel pursuant to the Louisiana Medical Malpractice Act. The trial court granted the exceptions and dismissed all claims against the defendants without prejudice. This appeal followed.

## DISCUSSION

The plaintiffs assert the following two assignments of error:

1. The trial court erred in sustaining defendants' exceptions raising the objection or prematurity, where defendants failed to meet their burdens of proving that plaintiffs' allegations of intentional tort fell within the ambit of Title 40.

2. The trial court erred in dismissing plaintiffs' well-pleaded factual allegations of intentional tort, which should have been allowed to proceed through adjudication.

Considering the above two assignments of error involve the same analysis, we will address them together.

Any action against health care providers concerning medical malpractice is subject to the Louisiana Medical Malpractice Act ("LMMA"). La. R.S. 40:1231.1, *et seq.*; *Medical Review Panel for Lane v. Nexion Health at Minden, Inc.*, 53,901 (La. App. 2 Cir. 8/11/21), 326 So. 3d 340, *writ denied*, 21-01410 (La. 11/23/21), 328 So. 3d 82. The LMMA requires that all claims against health care providers be reviewed through a medical review panel before proceeding to any other court. *Id.* This filtering process is done to pressure either the claimant to abandon a worthless claim or the defendant to settle the case reasonably. *Id.* However, the LMMA and its limitations on tort liability for a qualified health care provider apply strictly

5

to claims arising from medical malpractice. All other tort liability on the part of the qualified health care provider is governed by general tort law. *Coleman v. Deno*, 01-1517 (La. 1/25/02), 813 So. 2d 303; *McDowell v. Garden Court Healthcare, LLC*, 54,645 (La. App. 2 Cir. 8/10/22), 345 So. 3d 506, *writ denied*, 22-01364 (La. 11/16/22), 349 So. 3d 999.

A tort suit that is subject to the LMMA that is filed before the completion of the medical review panel process is subject to dismissal on an exception of prematurity. *McDowell*, *supra*. An action may be premature if it is brought before the right to enforce the claim sued upon has accrued. The exception of prematurity, as provided in La. C.C.P. art. 926, raises the issue of whether the judicial right of action has yet to come into existence because a prerequisite condition has not been fulfilled. *Campbell v. Nexion Health at Claiborne, Inc.*, 49,150 (La. App. 2 Cir. 10/1/14), 149 So. 3d 436. The burden of proving prematurity is on the moving party. In a medical malpractice action, the moving party must prove that it is entitled to a medical review panel because the plaintiffs' allegations fall within the scope of the LMMA. *Kelleher v. Univ. Med. Ctr. Mgmt. Corp.*, 21-00011 (La. 10/10/21), 332 So. 3d 654.

Where no evidence is presented at the trial of a dilatory exception, the court must render its decision on the exception based upon the facts as alleged in the petition, and all allegations therein must be accepted as true. *LaCoste v. Pendleton Methodist Hosp., LLC*, 07-008 (La. 9/5/07), 966 So. 2d 519; *Wendling v. Riverview Care Ctr., LLC*, 54,958 (La. App. 2 Cir. 4/5/23), --- So. 3d ---, 2023 WL 2777997. Because the question of whether a claim sounds in medical malpractice is a question of law, appellate review

6

of the trial court's grant of the dilatory exception of prematurity is *de novo*. *Wendling*, *supra*; *Jackson v. Willis-Knighton Health Sys.*, 54,405 (La. App. 2 Cir. 4/13/22), 337 So. 3d 625.

La. R.S. 40:1231.1(A)(13) defines malpractice as:

"Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.

Health care is defined as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." La. R.S. 40:1231.1(A)(9). Tort is defined as "any breach of duty or any negligent act or omission proximately causing injury or damage to another." La. R.S. 40:1231.1(A)(22). The LMMA serves to limit the rights of tort victims, and as such, its coverage should be strictly construed. *Richard v. Louisiana Extended Care Centers, Inc.*, 02-0978 (La. 1/14/03), 835 So. 2d 460.

The Louisiana Supreme Court set forth a six-factor test to determine whether a negligent act is covered under the LMMA in *Coleman*, *supra*. Those factors are: 1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill; 2) whether the wrong requires expert medical advice to determine whether the appropriate standard of care was breached; 3) whether the pertinent act or omission involved assessment

7

of the patient's condition; 4) whether an incident occurred in the context of a physician-patient relationship; 5) whether the injury would have occurred if the patient had not sought treatment; and 6) whether the tort alleged was intentional. *Coleman*, *supra*.

In the present matter, the only disputed *Coleman* factor is the sixth, *i.e.* whether the alleged torts committed by the defendants were intentional. When analyzing whether acts should be considered intentional, this court has stated that:

> Regarding intentional torts, the meaning of intent is that the person who acts either 1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or 2) **knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result.** Thus, intent has reference to the consequences of an act rather than to the act itself. Act is distinguished from intent in that the word act is used to denote an external manifestation of the actor's will which produces consequences. That act must proceed from volition of the actor. 1 William E. Crawford, Tort Law, § 12:4 in 12 Louisiana Civil Law Treatise (2d ed. 2009). For example, terms such as "should have known" may raise issues of negligence or gross negligence, but do not amount to "intentional" as that term is used in the Worker's Compensation Act. *Id.*, citing *Adams v. Time Saver Stores, Inc.*, 615 So. 2d 460 (La. App. 4 Cir. 1993), *writ denied*, 617 So. 2d 910 (La. 1993).

*Evans v. Heritage Manor Stratmore Nursing & Rehab. Ctr., LLC*, 51,651 (La. App. 2 Cir. 9/27/17), 244 So. 3d 737, *writ denied*, 17-1826 (La. 12/15/17), 231 So. 3d 639, quoting *White v. Glen Retirement Sys.*, 50,508 (La. App. 2 Cir. 4/27/16), 195 So. 3d 485 (emphasis added). Here, plaintiffs focus their arguments on the second definition of intentional, arguing that the defendants were each substantially certain that their actions would result in harm to Self.

An examination of jurisprudence reveals that Louisiana courts have rarely determined that a health care provider committed an intentional tort against a patient. For example, this court found that a patient's claims that her physician at an inpatient facility sexually abused her were intentional tort, rather than malpractice, and did not fall under the LMMA. *Heacock v. Cook*, 45,868 (La. App. 2 Cir. 12/29/10), 60 So. 3d 624; *see also*, *L.T. v. Chandler*, 40,417 (La. App. 2 Cir. 12/14/05), 917 So. 2d 753; *Fuentes v. Doctors Hosp. of Jefferson*, 01-0305 (La. App. 4 Cir. 11/21/01), 802 So. 2d 865. However, in *Evans*, *supra*, a nursing assistant went to change the diaper of a resident, and he physically resisted, striking her in the face. In return, she struck the patient in the face, cutting his eye and causing bruising. This court held that striking the patient was not an intentional act because she did not intend the consequences of her act and his claim was more in the nature of gross negligence rather than an intentional act. Thus, the claim sounded in medical malpractice and was subject to the LMMA.

In the present case, for every allegation made in their petition against each defendant, plaintiffs have stated that the defendants made "willful, deliberate, and intentional choices" and "these intentional choices made it predictable or substantially certain harm would occur to Mrs. Self." This court has held that something more than a conclusory allegation of intentional conduct is required. *Butler-Bowie v. Olive Branch Senior Care Ctr.*, 52,520 (La. App. 2 Cir. 2/27/19), 266 So. 3d 478; *see also*, *Morrow v. Louisiana Med. Mut. Ins. Co.*, 22-1006 (La. App. 1 Cir. 2/24/23), --- So. 3d ---, 2023 WL 2198821. "Where special statutes limit the tort cause of action to claims based on intentional conduct, the plaintiff is required to allege at

9

least some facts; the mere invocation of the word 'intentional' will not create a cause of action." *Id.*

If plaintiffs' allegations of intentional tort are correct, then every health care provider who provided care to Self would have consciously desired the physical result of their acts or known that the result was substantially certain to follow from their conduct. We do not find this to be accurate. The allegations made by plaintiffs in their petition are not intentional torts but, rather, detail allegations of gross negligence and substandard medical care at all levels of treatment. Simply labeling the defendants' actions as intentional is not sufficient to avoid the LMMA and the required medical review panel. While we find the allegations made about Self's treatment to be disturbing on multiple instances, they are nevertheless subject to the LMMA. We find the defendants satisfied their burden of proving that plaintiffs' allegations are subject to the LMMA, and plaintiffs have failed to plead factual allegations of intentional tort in their petition. As such, the district court committed no legal error in sustaining the exceptions of prematurity.

## CONCLUSION

For the reasons set forth above, the judgments granting the exceptions of prematurity are affirmed. All costs are to be paid by the plaintiffs, Crystal Self, Todd Self, and on behalf of their minor children, Cora Self and Carsyn Self.

**AFFIRMED.**

10