# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 21-744

KATHLEEN MAY, ET AL

VERSUS

DIVERSIFIED HEALTHCARE-ABBEVILLE, LLC, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 107619-C
HONORABLE THOMAS JAMES FREDERICK, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**J. LARRY VIDRINE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, John E. Conery, J. W. Perry, Charles Fitzgerald and J. Larry Vidrine, Judges.[1]

**REVERSED AND REMANDED.**

Fitzgerald, C., dissents and assigns reasons.
Conery, J., dissents for the reasons assigned by Judge Fitzgerald.

---

[1] Honorable J. Larry Vidrine participated in this decision by Appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Brady Dean King, II**
**McNew, King & Landry, LLP**
**2400 Forsythe Ave., Suite 2**
**Monroe, LA 71201**
**(318) 361-3140**
**COUNSEL FOR INTERVENOR-APPELLEE:**
     **Louisiana Patient's Compensation Fund**

**Troy Allen Broussard**
**Allen & Gooch**
**P. O. Drawer 81129**
**2000 Kaliste Saloom Rd,Ste 400**
**Lafayette, LA 70598**
**(337) 291-1370**
**COUNSEL FOR DEFENDANTS-APPELLEES:**
     **Diversified Healthcare-Abbeville,  LLC et al,**
     **Brett Bernard**

**Scott Webre**
**Whitney S. Ikerd**

**Webre and Associates**
**2901 Johnston St., Suite 300**
**Lafayette, LA 70503**
**(337) 237-5051**
**COUNSEL FOR PLAINTIFFS-APPELLANTS:**
     **Kathleen May**
     **Jason Landry**
     **Dale Landry**
     **Janet Hebert**
     **Wendy Lopex**
     **Todd Landry**
     **Elaine Hebert**
     **Karen Romero**
     **Chad Landry**
     **Jenny Menard**

**Vidrine, Judge – Pro Tempore,**

Plaintiffs-Appellants, the adult children of decedent, appeal the trial court's judgment sustaining a nursing home's dilatory exception on grounds of prematurity.

For the following reasons, we conclude that the nursing home, on the record presented, did not discharge its burden of establishing that the negligence alleged by Plaintiffs sounded in medical malpractice as required by the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41, *et seq.* (the MMA). Therefore, we reverse the trial court and remand this matter to for further proceedings consistent with this opinion.

## FACTS

The material facts established by the record are not in dispute.

Decedent, Shirley Landry, sustained serious burns caused by smoking in her bed at the 128-bed resident capacity Maison du Monde Nursing Home in Abbeville. Ms. Landry was eighty years old and resided at Maison du Monde following a stroke that left her paralyzed on the left side of her body. She was bed bound and unable to get out of bed without assistance. Defendants presented no evidence to show that Ms. Landry's cigarettes and lighter were placed beyond harm's way, or that there was a place where families or staff could do so overnight.

By Maison du Monde nursing home policy, Ms. Landry was permitted to keep smoking materials provided she was deemed to be a "safe smoker" by the nursing home's policy. The task of deeming a resident a "safe smoke" was delegated to the nursing home's social services director, Ms. Brett Bernard. Ms. Bernard had some time before received a Bachelor's degree in social work from Grambling State University, but never secured a State professional license in her field.

1

Citing the six factor test from *Coleman v. Deno*, 01-1517 (La. 1/25/02), 813 So. 2d 303, 315, Plaintiffs maintain that the trial court erred in finding that Defendant had established that the MMA's provisions requiring utilization of a medical review panel had been triggered and proceeded to make its case accordingly. Defendant countered this argument by citing *Coleman* but did not offer much detail in support of its position.

The Louisiana Patient's Compensation Fund also intervened in this appeal, summarizing as follows the claims made by Plaintiffs:

> The pled acts of negligence centered around Maison du Monde's alleged failure to ascertain the competency and status of Ms. Landry and her ability to possess and use matches, lighters, or cigarettes and the failure to prevent smoking indoors by a resident, particularly while a resident is in bed.

## APPLICABLE LAW

A dilatory exception of prematurity asks whether a cause of action is ripe for judicial determination. *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 04-0451 (La. 12/1/04), 888 So. 2d 782, 785. In evaluating an exception of prematurity, a court may look to the evidence offered at the hearing as well as the allegations of the petition. La. C.C.P. art. 926; *LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 2007-0008 (La. 9/5/07), 966 So. 2d 519, 523-24. If no other evidence is offered at trial, the allegations in the petition must be accepted as true. *Id.* at 525. The party asserting the prematurity exception has the burden of proving that it is entitled to a medical review panel because the allegations fall within the LMMA. *Id.* at 523-24.

The Louisiana Legislature enacted the LMMA in response to a "perceived medical malpractice insurance 'crisis.'" *Williamson v. Hospital Serv. Dist. No. 1 of Jefferson*, 04-0451 (La. 12/1/04), 888 So. 2d 782, 785. The legislature "intended the LMMA to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical service to the public" by giving qualified health care providers two advantages: a limit on the amount of damages, and the right to an opinion from a medical review panel before a plaintiff may proceed in litigation. *Dupuy v. NMC Operating Co., L.L.C.*, 2015-1754 (La. 3/15/16), 187 So. 3d 436, 439. As such, the LMMA is special legislation in derogation of the rights of tort victims, and its limitations on tort liability "apply strictly to claims 'arising from medical

2

malpractice.'" *Billeaudeau*, 218 So. 3d at 520 (quoting *Coleman v. Deno*, 813 So. 2d at 315).

Statutory interpretation begins with the language of the statute itself. *Arabie v. CITGO Petroleum Corp.*, 10-2605 (La. 3/13/12), 89 So. 3d 307, 312. The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter, and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting it. *City of Pineville v. American Federation of State, County, & Municipal Employees, AFL-CIO, Local 3352*, 00-1983 (La. 6/29/01), 791 So. 2d 609, 612. Courts are bound to construe all parts of a statute and to construe no sentence, clause, or word as meaningless if a construction giving force to and preserving all words legitimately can be found. *McGlothlin v. Christus St. Patrick Hosp.*, 10-2775 (La. 7/1/11), 65 So. 3d 1218, 1228-29.

The LMMA defines "malpractice" as:

[A]ny unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.

La. R.S. 40:1231.1(A)(13).

"Health care" is defined in the LMMA as "any action or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." La. R.S. 40:1231.1(A)(9). Whether a claim sounds in medical malpractice is a question of law reviewed under a *de novo* standard. *Matherne v. Jefferson Parish Hosp. Dist. No. 1*, 11-1147 (La. App. 5 Cir. 5/8/12), 90 So. 3d 534, 536.

*Thomas v. Reg'l Health Sys. of Acadiana, Inc.*, 19-507, 19-524 at pp.6-8 (La. 1/29/20), __ So.3d __.

At the heart of this appeal is whether Plaintiffs' allegations sound in general tort, which is presumed unless proven otherwise, or in medical practice. La. R.S. 40:1231(10) defines the parties protected by the MMA to include licensed social

3

workers and nursing homes. Ms. Bernard is not a licensed social worker, so she is not protected in her own right. However, she serves a licensed nursing home that is protected by the MMA at least with respect to claims sounding in malpractice pertaining to nursing homes falling within the MMA. Therefore, the question presented is whether the acts giving rise to this litigation constitute medical malpractice.

> The MMA applies only to "malpractice;" all other tort liability on the part of a qualified heath care provider is governed by general tort law. *Spradlin [98–C–1977*
>
> *Spradlin v. Acadia-St. Landry Med. Found., 1998-1977 (La. 2/29/00), 758 So. 2d 116*
> *], supra.* "Malpractice" is defined by La.Rev.Stat. 40:1299.41A(8) as follows:
>
> "Malpractice" means any *unintentional tort* or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient. . . .(Emphasis added).

La.Rev.Stat. 40:1299.41 A(7) and (9) further define "tort" and "health care" as follows:

> "Tort" means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
>
> "Health care" means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement.

*Coleman v. Deno*, 01-1517, p. 16, 813 So.2d at 315.

In close cases, such distinctions are addressed by application of the six factor test first articulated in *Coleman*:

In determining whether certain conduct by a qualified health care provider constitutes "malpractice" as defined under the MMA this court has utilized the following three factors:

"[1] whether the particular wrong is 'treatment related' or caused by a dereliction of professional skill,

[2] whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached, and

[3] whether the pertinent act or omission involved assessment of the patient's condition."

*Sewell v. Doctors Hospital,* 600 So.2d 577, 579 n. 3 (La.1992)(quoting Holly P. Rockwell, Annotation, *What Patient Claims Against Doctor, Hospital, or Similar Health Care Provider Are Not Subject to Statutes Specifically Governing Actions and Damages for Medical Malpractice,* 89 A.L.R.4th 887, 1991 WL 741765 (1991)).[16] The latter annotation lists three additional factors that courts have considered, and we now add those to our *Sewell* list; to wit:

[4] whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

[5] whether the injury would have occurred if the patient had not sought treatment, and

[6] whether the tort alleged was intentional.
89 A.L.R.4th at 898.

*Coleman v. Deno*, 813 So.2d at 315–16.[2]

Citing *Coleman*, the trial court determined that the negligence alleged by Plaintiffs fall within the MMA, but its Written Reasons offered no elaboration for its conclusion. Regardless, all parties agree that we are required to "conduct a *de*

---

[2] Footnote 16 of the *Coleman* opinion made the following observation:

In several recent decisions by this court, we have classified various claims as outside the scope of the Act. In *Sewell, supra,* we concluded that a strict liability claim for the collapse of a bed was not malpractice. And, in *Hutchinson v. Patel,* 93–2156 (La.5/23/94), 637 So.2d 415, we held that the claim of a patient's wife against a hospital and psychiatrist for their alleged failure to warn or to take other precautions to protect the wife against threats of violence communicated to the psychiatrist by the patient-husband were not malpractice.

5

*novo* review of the trial court's grant of the dilatory exception of prematurity, as the issue of whether a claim sounds in medical malpractice involves a question of law." *Rivera v. Bolden's Transp. Serv., Inc.*, 11-1669, p. 5 (La. App. 1 Cir. 6/28/12), 97 So.3d 1096, 1100–01, citing *Hernandez v. Diversified Healthcare–Abbeville, LLC,* 09–546 (La.App. 3rd Cir.11/4/09), 24 So.3d 284, *writ denied,* 09–2629 (La.2/12/10), 27 So.3d 849.

There is remarkably little insight to be gleaned from reported cases involving nursing home smokers in the context of the MMA. *Dutrey v. Plaquemine Manor Nursing Home*, 12-1295 (La.App. 1 Cir. 6/17/13), 205 So.3d 934, involved a nursing home patient who was severely burned when his shirt caught fire, ultimately resulting in his death. The patient in *Dutrey* was blind and had dementia yet was allowed to smoke a cigarette unsupervised. Noting that the Court's "independent research did not reveal any cases on point, the *Dutrey* court concluded that its reasoning in *McKnight v. D & W Health Services, Inc.*, 02-2552 (La.App. 1 Cir. 11/7/03), 873 So.2d 18, provided valuable guidance given the circumstances presented by *Dutrey*:

> In *McKnight*, the mother of a nursing home resident filed suit under the Nursing Home Resident's Bill of Rights (the NHRBR), after her son had allegedly wandered from the home's premises and died of heat exhaustion, exposure, and other causes. This Court found that the allegations that the nursing home operator violated the duties imposed on it by the NHRBR where it failed to properly supervise and restrain her son from leaving its premises brought the claims within the requisite context of "health care" rendered to a "patient" during his "confinement" at a nursing home. This Court concluded that the allegations, if proven, amounted to a "dereliction of professional skill," and the fact of the competing duties under the NHRBR, which subjected the nursing home operator to professional standards of care, would likely require expert testimony. *McKnight,* 02-2552 at p. 6, 873 So.2d at 22.

Accordingly, in *McKnight*, this Court found the allegations supported the nursing home operator's right to a medical review panel under the MMA. *See McKnight*, 02-2552 at p. 6, 873 So.2d at 22, *citing Price v.*

6

*City of Bossier City*, 96-2408, p. 2 n.2 (La. 5/20/97), 693 So.2d 1169, 1172-73 n.2.

*Dutrey v. Plaquemine Manor Nursing Home*, 12-1295, pp. 17-18 (La. App. 1 Cir. 6/17/13), 205 So. 3d 934, 947. Under those circumstances, the *Dutrey* court concluded that the MMA provisions applied.

Aside from *Dutrey*, *Richard v. Louisiana Extended Care Centers, Inc.*, 02-978 (La. 1/14/03), 835 So. 2d 460, contains perhaps the only reference by a Louisiana court to a nursing home smoker in the context of the MMA. In *Richard,* the Louisiana Supreme Court observed that of the twenty-two different rights enumerated by the Nursing Home Residents' Bill of Rights, a resident's right to smoke is one that "could never be characterized as 'malpractice.'" Id., at 467.

Thus, it is against this backdrop and Defendant's burden of proof that we consider *de novo* whether the MMA was properly found by the trial court to govern.

Given the six *Coleman* factors and the evidence in this case, we find that plaintiff's claim fall outside the scope of the MMA, and Defendant has not proven otherwise.

    *(i)    whether the particular wrong is "treatment related" or caused by a dereliction of professional skill*

Under the circumstances demonstrated by the record, we conclude that the harm sustained by decedent wwas neither treatment related nor caused by the dereliction of professional medical skill.

The circumstances presented by this controversy contrast in several material respects with those of *Dutrey* and *McKnight.*

*Dutrey* involved a licensed medical professional, a Licensed Practical Nurse "assigned to decedent" who was alleged to have provided substandard care by failing to properly supervise her patient's condition, conduct and state of mind.

7

This case does not concern the provision of *medical* care by such a licensed health professional, but rather the nonmedical care of an unlicensed social worker. Second, while this case concerns a nursing home resident who was frail, it does not concern one who was either blind or demented. Underscoring the medical services component required by the MMA, the Supreme Court in *Richard,* citing *Price v. City of Bossier of Bossier City*, 96-2408 (La. 5/20/97), 693 So.2d 1169, stated:

> [As] this Court stated in *Price,* "[w]hile clearly an act of malpractice can occur in the rendition of professional services, the patient must still be in the process of receiving 'health care' from the doctor or hospital when the negligent rendition of professional services occurs." 693 So.2d at 1172. "This means that the act or omission must have occurred 'during the patient's medical care, treatment or confinement.'" *Id.* at 1172-73.

> In the case of a nursing home, the nursing home resident is not always receiving medical care or treatment for any specific condition, but can always be said to be "confined" to the nursing home. However, in our view, it was not the intent of the legislature to have every "act. . . by any health care provider. . . during the patient's . . . confinement" in a nursing home covered by the MMA. La. R.S. 40:1299.41(A)(9) defining "health care" under the MMA).

*Richard* 835 So. 2d at 468.

The record in this case does not establish that decedent was receiving health care when she was injured.

As with *LaCoste v. Pendleton Methodist Hosp., L.L.C.,* 07-8 (La. 9/5/07), 966 So. 2d 519, Plaintiffs' "allegations of misconduct in this civil suit do not relate to medical treatment or the dereliction of professional medical skill." In short, this case does not involve a medical injury *per se*, nor does it include injuries falling within the constellation of the MMA, such as the "treatment related" infectious diseases acquired during surgery and arising from a medical provider's obligation to furnish a clean and sterile environment. *Dupuy*, 187 So.3d at 440.

Nor can it be said that the injury was caused by a dereliction of the sort of professional skill the MMA or *Coleman* and its progeny envisioned. To the contrary,

8

the record shows that Defendant went out of its way, for whatever its reasons, to steer the supervision and enforcement of its voluntary smoking policy away from licensed medical professional personnel including physicians and its own Director of Nursing, licensed Registered Nurse Sophia Ditch, and instead placed it in the hands of unlicensed social worker, Ms. Bernard. Here is the Director of Nursing's testimony:

> Q. And Ms. Bernard is the person who performs all of the safe-smoking assessments at the facility, correct?
>
> A. Yes.
>
> Q. Or at least at that time, right?
>
> A. Yes.
>
> Q. Is Ms. Bernard under your supervision?
>
> A. No.
>
> Q. Who is her direct supervisor?
>
> A. The administrator.
>
> Q. Do you have any involvement with the safe -smoking assessment?
>
> A. No.

Nor did Defendant produce testimony to establish involvement by any licensed physician. In fact, Ms. Bernard's testimony leaves the clear impression that she did not even know who decedent's treating physician was until she was called to testify and saw his name:

> Q. Do you know who Ms. Landry's, Ms. Shirley Landry's physician was, attending physician, while she was at Maison du Monde?
>
> A. Yes, sir.
>
> Q. I'm sorry. Was that yes or no?

A. Yes, sir.

Q. Who was that?

A. Dr. Lahasky.

Q. Did you ever talk to Dr. Lahasky about Ms. Landry?

A. No, sir.

Q. How is it that you recall Ms. Landry's physician? I mean, and I don't mean to be cute by that. I mean, do you just have a really sharp memory, or is Dr. Lahasky the attending for all of the residents there, or what exactly?

*A. I saw the name on the smoking assessment.*

Under these circumstances, plus the Fire Marshall's report indicating that decedent's room contained a sprinkler system that did not activate, neither we nor Defendant can now say that the injuries sustained by decedent were 'treatment related' or caused by a dereliction of 'professional skill' within the meaning of the Medical Malpractice Act." *Williamson*, 888 So.2d at 790.

Moreover, since Ms. Bernard never secured her professional license in social work, by its own definition, her conduct was not covered by the MMA pursuant to La. R.S. 40:1231(10) for the nonmedical professional services she provided as a social worker. *See generally, O'Brien v. Rizvi*, 04-2252, 04-2257 (La. 4/12/05), 898 So.2d 360; *Aziz v. Burnell*, 21-130 (La.App.3 Cir. 11/3/21), 330 So.3d 695, *writ denied*, 21-1790 (La. 2/15/22), __ So.3d ___.

(ii)     *whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached*

We further conclude that Defendant failed to establish that expert medical evidence will be required to determine whether Defendant, through its social worker, breached the appropriate nonmedical standard of care applicable to Plaintiffs' claims.

Not every unintentional tort committed by a qualified health care provider falls within the purview of the LMMA; only those torts that constitute medical malpractice do so. *Williamson,* p. 9, 888 So.2d at 788. Though the Defendant has suggested possible qualities for medical experts who might be nominated to the panel and who could determine the merits of the Plaintiffs' claims, it is the Louisiana court that decides whether a tort claim against a qualified medical provider must first be presented to the medical review panel.

*LaCoste,* 966 So. 2d at 527.

Regardless of which party might ultimately prevail on the merits, Defendant has not established that expert testimony, medical or otherwise, will be required to establish the appropriate standard of care. *Lacoste*, at 526-527. *See also*, *Cambridge Mut. Fire Ins. Co. v. State Farm Fire & Cas. Co.*, 405 So. 2d 587, 588 (La. Ct. App. 1981).

(iii) *whether the pertinent act or omission involved assessment of the patient's condition*

In brief, Plaintiffs argue that the safe smoking assessment by Ms. Bernard did not involve the kind of medical assessment performed by healthcare providers utilizing specialized skills and knowledge, or to assess a patient's medical condition – a task she was neither qualified nor able to perform.

The evidence compels us to agree with this assertion. The testimony supplied by both Ms. Bernard and Nursing Director Ditch indicates that Ms. Bernard was charged with performing safe smoking assessments, which the evidence shows were simple instruments used to document residents' short-term and long-term memory. Relevant excerpts of Ms. Bernard's testimony follow.

With respect to the nature of the "short-term memory tests" performed:

Q. Ma'am, do you remember the performance of the short-term memory test on Ms. Landry?

A. Yes.

Q. What do you remember about that?

11

A. Her answering the questions asked.

Q. Did you document the content of that visit or the short-term memory test in any record, other than this Safe Smoking Assessment?

A. No, sir.

. . . .

Q. So take us through that. How would you ask questions, in order to assess short-term memory?

A. Ask name, day of the week, what you had for breakfast.

Q. Anything else?

A. I mean, it can vary. But that's, basically, the questions asked.

With respect to the nature of "long-term memory tests" performed:

Q. What about long --term memory? How would you test long-term memory?

A. Ask date of birth, how many children they may have, marriage, schooling.

Q. Okay. Anything else?

A. No, sir.

Clearly these assessments were not very complex, nor was the training Ms. Bernard received from her predecessor:

Q. Did you undergo training at Maison du Monde to perform a safe smoking assessment?
A. Yes, sir.

Q. Who trained you?

A. The prior social worker.

. . . .

Q. What forms or documents do you recall using in connection with your training?

12

A. This form, the Safe Smoking Assessment.

. . . .

Q. And what did she or how did she train you to perform this safe smoking assessment when reviewing this form that we've looked at?

A. She showed me the form. Basically, read it. And then I shadowed her.

Moreover, the record does not make clear that the outcome of the assessments even had any impact on whether any nursing home resident, specifically including our decedent, was permitted to smoke in her room or to have cigarettes or combustible articles at her bedside.

At one point Ms. Bernard implied that a resident would pass the Safe Smoking Assessment even if a family member had to help her smoke:

Q. You agree then, that as of October 11, 2017, which follows your first Safe Smoking Assessment, you learned from a daughter. Do you remember which daughter?

A. No, sir.

Q. But you learned from a daughter that she has a cigarette here and there, but not daily. And you observed the resident safely holding a cigarette, when the family lit the cigarette. And the resident lighting cigarette, while family holding. Is that your memory of what you observed?

A. Yes.

Q. And then requiring a family member to remain with resident, at all times, when smoking; correct?

A. Correct.

. . . .

Q. And it was your finding, on October 11, that Ms. Landry required supervision while smoking;

correct?

A. Correct.

Q. And you felt it was the family's duty to
provide that supervision. Is that fair?

A. Because, according to this note,
the family was there.

Q. Yes, ma'am, I understand that. But
the family wasn't always there; right?

A. Correct.

Q. And so if Ms. Landry was to smoke
when the family wasn't there, that would require
what?

A. Nothing. If the family wasn't there,
then, they were not there.

At another point Ms. Bernard reaffirmed that a resident would be designated

a "safe smoker" even if it were demonstrated that they could not safely light and

smoke a cigarette alone:

Q. Does the degree of supervision required while
smoking impact the determination of when
cigarettes can safely be allowed in the
resident's room, cigarettes and lighter?

A. Is the degree -- repeat that holding of the cigarette, then   that box
under Resident Observation, the first one, would have to be checked no;
correct?

A. No, sir.

Q. So even if the family has to hold the cigarette
or assist the resident when lighting a
cigarette, you would check that first box yes
under the sections resident can light and smoke
a cigarette while demonstrating safe technique?

A. Correct.[3]

_____

This was even Ms. Bernard's opinion knowing decedent's compromised physical condition:

> Q. Do you recall what physical deficits Ms. Landry had?
>
> A. She had a stroke.
>
> Q. Well, that's -- okay. So what physical deficits did that create for her?
>
> A. Limited on one side.
>
> Q. So how do you imagine a -- Ms. Landry, limited on one side, could safely light a cigarette alone?
>
> A. Observation.

At still another point she said otherwise:

> Q. How do the nursing --- how does Maison du Monde determine when a resident should be allowed to keep cigarettes and lighter in their room?
>
> A. Based on the smoking assessment.
>
> Q. So if a resident is determined to be a safe smoker, they are allowed cigarettes and lighter in their room; correct?
>
> A. Correct.
>
> Q. If they are determined not to be a safe smoker, then, obviously, they cannot keep cigarettes in their room; correct?
>
> A. Correct.

Considering the evidence presented, Defendant has not demonstrated that the assessments warrant any weight under *Coleman.*

> *(iv) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform*

15

There is not any evidence in the record to demonstrate that the incident here occurred in the context of a physician-patient relationship.

Indeed, given the opportunity to present evidence to make this point, Defendant presented the testimony of two employees who confirmed that there was no physician involvement.

Likewise, Defendant cites no authority suggesting that nursing homes are required to perform Safe Smoker Assessments of any kind, let alone those as superficial as those revealed by the record before us.

*(v) whether the injury would have occurred if the patient had not sought treatment*

Defendant has not established that the injury decedent sustained had any connection to her medical treatment, if only because it did not establish that decedent received any medical treatment at the nursing home, certainly none related to smoking cessation or therapy that would result in her ability to safely smoke cigarettes.

Moreover, there is no reason to assume that decedent could not have as easily died at home as the same cause that took her life at the nursing home, smoking in bed unsupervised and unrestricted, with cigarettes and lighter nearby.

*(vi) whether the tort alleged was intentional*

Neither party alleges an intentional tort on the part of Defendant or its employees.

*Conclusion*

In view of the above, our *de novo* review of the record and application of *Coleman* analysis leads us to conclude that Defendants have not discharged their burden of establishing that the conduct on which plaintiff's claims are premised fit within the ambit of the MMA statutory definition of "malpractice."

16

This is not to say Plaintiffs will prevail on the merits, as even with our holding that Plaintiffs' cause of action is "ripe for judicial determination" per *Thomas* and its cited authority, will still have to bear the burden of establishing that Defendant was at fault in causing the accident, using a duty-risk analysis.

> This is a five-step process which requires a party asserting fault of another in causing him damages, to establish: (1) that the party whose fault is at issue had a duty to conform his conduct to a specific standard, (2) that the party's conduct failed to conform to the appropriate standard, (3) that the party's conduct was a cause-in-fact of the injuries at issue, (4) that the party's substandard conduct was a legal cause of the injuries at issue, and (5) that there were actual damages. *Toston v. Pardon,* 03–1747 (La.4/23/04), 874 So.2d 791. The plaintiff's failure to prove any of the elements of the duty-risk analysis results in a determination of no liability. *Lemann v. Essen Lane Daiquiris, Inc.,* 05–1095 (La.3/10/06), 923 So.2d 627.

*Jones v. Centerpoint Energy Entex*, 11-2, p. 4 (La. App. 3 Cir. 5/25/11), 66 So.3d 539, 545, *writ denied,* 11-1964 (La. 11/14/11), 75 So.3d 946, cited by *Mills v. Smith*, 19-812 (La. App. 3 Cir. 4/8/20), __ So.3d___.

**DECREE**

For the foregoing reasons, the judgment of the trial court sustaining Defendant's dilatory exception is reversed, the dilatory exception is overruled, and this proceeding is remanded to the trial court for further proceedings consistent with this opinion, with costs taxed to the owner of Maison du Monde Nursing Home, Diversified Healthcare of Abbeville, LLC.

**REVERSED AND REMANDED.**

KATHLEEN MAY, ET AL.

VERSUS

DIVERSIFIED HEALTHCARE-ABBEVILLE, LLC, ET AL.

**Fitzgerald, Judge, dissenting with reasons.**

In my view, the trial court correctly affirmed the nursing home's exception of prematurity. The plaintiffs here claim that the nursing home failed to properly assess Shirly Landry's smoking ability. A "safe smoker" assessment necessarily entails an evaluation of the resident's mental acuity and physical limitations. This fits squarely within the scope of the Louisiana Medical Malpractice Act (the "MMA").

In addition, the plaintiffs allege that the nursing home was negligent in failing to ensure safe smoking by Shirly Landry, and in failing to ensure that Ms. Landry did not maintain possession of cigarettes and a lighter within reach of her bed. This involves an analysis of the degree of care, including supervision and monitoring, that the nursing home should have provided to Ms. Landry based on her medical conditions. And this, too, fits squarely within the scope of the MMA.